**Bill B. HARP, Administrator of the Estate of Joy Opal Harp, Deceased, Plaintiff-Appellant,**

v.

**MONTGOMERY WARD & CO., a corporation, Defendant-Appellee.**

**No. 19185.**

United States Court of Appeals
Ninth Circuit.

Sept. 4, 1964.

Glenn D. Ramirez, Klamath Falls, Or., for appellant.

Wayne Williamson, Mautz, Souther, Spaulding, Kinsey & Williamson, Portland, Or., Smith & Card, Klamath Falls, Or., for appellee.

Before MADDEN, Judge of the United States Court of Claims, and HAMLEY and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge:

In this diversity case, tried to a jury, judgment was entered in favor of the plaintiff and against the defendant, in the amount of $25,000. On motion of the defendant that judgment be entered in favor of the defendant notwithstanding the verdict, the District Court set aside the verdict and judgment previously entered, and rendered judgment in favor of the defendant that plaintiff take nothing by reason of the action. Plaintiff appeals from the last mentioned judgment.

The plaintiff, as administrator of the estate of his deceased wife, sought to recover against the defendant on behalf of himself as surviving spouse of the decedent, and for three minor children, damages for her wrongful death alleged to have been caused by the negligence of the defendant.

There is no dispute that the decedent met instant death by electrocution while taking a bath in a bathtub, when she came into contact with an ungrounded electric clothes drier purchased from the defendant, and installed in the bathroom close to the bathtub.

Taking the evidence in the light most favorable to the plaintiff, and resolving all reasonable inferences in his favor, as we must in view of the present status of the case, the following is a reconstruction of the events leading up to the death of the decedent:

On or about October 8, 1958, the plaintiff and his wife purchased from the defendant a new electric clothes drier. Prior to, and at the time of the purchase, defendant was informed that the drier was to be installed in the bathroom of the home, close to the bathtub, and that their home was wired for 120 volts. The electric drier was designed for a voltage of 240. Defendant assured plaintiff and his wife that the placement of the drier in the bathroom close to the bathtub offered no problem, and that the 240-volt drier offered no problem as the defendant would make the required adjustment in the drier. Defendant agreed that it would deliver, install and ground the drier. The drier was not immediately delivered, and in a couple of days plaintiff picked up the drier at defendant's place of business and again defendant promised that it would install the same. Plaintiff placed the drier in the bathroom of his home and after several days called the defendant and inquired if he should ground the drier himself or was the defendant going to come out and ground the same. The defendant agreed that it would come right out and ground the machine. Defendant advised the plaintiff that the warranty upon the machine would not be applicable if he were to ground the drier himself. After failure of the defendant for several days to install and ground the drier, plaintiff and his wife commenced the use of the same. About three months later, plaintiff complained to defendant that the drier was not drying the clothes properly and inquired if the defendant was ever going to "come out and insulate and see that the drier was working properly." The representative of the defendant informed plaintiff that the matter had escaped his mind and that he would try to make it and come out. He never did.

The grounding of the drier was never accomplished, and on January 25, 1962, the decedent came in contact with the

ungrounded drier and suffered the shock which resulted in her death.

The manner of converting the 240-volt drier for 120-volt installation was described by the sales manager of the defendant, as follows:

"Q. * * * When a drier comes what type of a plug-in do you have on the back wired up? What setup do you have wired up?

"A. You have three terminals coming out of the back of it.

"Q. If you were to wire it for 240 what would you do?

"A. You would put on what they call a pigtail.

"Q. How is that attached to the three terminals?

"A. There is three lugs that holds three wires.

"Q. And with respect to the plug-in what type of plug-in do you have?

"A. Well, it would depend on the wiring of the house, either the range, the older type with the range, or the drier plug-in. It is similar to the range type plug-in.

"Q. Is it a three-pronged plug in? That is what I am getting at.

"A. Yes.

"Q. Now, when you wire for a 120, what do you do with those three terminals?

"A. I believe on most of them you put a jumper from the two outside terminals and a regular 110-volt cord from the center and one on the outside. That is standard on most of those.

"Q. Then you have a two plug-in outlet?

"A. Yes, sir."

Mr. Seideman, an electrician called on behalf of the plaintiff, testified that a 240-volt drier would have a three-conductor cord, while a 120-volt drier would have a two-conductor cord.

The two-conductor cord attached to the drier in question was equipped with a two-pronged plug which was inserted in the electric outlet located on the wall of the bedroom adjacent to the bathroom. It is clear from the testimony that if the drier had been grounded to an outside water pipe, the insertion of the plug in the wrong manner would have blown the fuse and caused no damage. Absent the grounding of the drier, the insertion of the plug in the wrong manner energized the frame of the drier which would produce a fatal shock to a person who, while wet or standing in water, came in contact with the drier.

The evidence discloses that there was no indication on the two-pronged plug to indicate the right or wrong way of plugging it in. The right or wrong way of plugging in could only be determined by using a voltmeter from the drier to the water system. These facts were known to the representatives of the defendant at the time of the purchase of the drier. In this respect is the testimony of the salesmanager for the defendant, following the question:

"Q. With respect to that, were you aware during the time that you were servicing these driers that if you switched the way you plugged it into the wall plug that you energized the body of the drier?

"A. Yes, sir."

The head of the appliance department of the defendant testified that it was necessary and in the interest of safety to ground a 240-volt drier for 120-volt installation.

An electrical safety engineer called as a witness by the plaintiff, who examined the drier and its installation shortly after the death of the decedent, testified that he could find no indication that the drier had ever been grounded. The following extract is taken from his testimony:

"Q. Now, Mr. Collins, to summarize your testimony, if you plugged the drier in one way it was properly grounded and the cover of the drier itself was not energized; is that correct?

"A. Repeat your question, please.

"Q. As I understand it, if you plugged the drier in one way, which would properly ground it, the cover of the drier was not energized or did not contain loose electricity?

"A. That is right. .

"Q. If you turned it in the other way it did contain loose electricity?

"A. Well—

"Q. By 'loose electricity' I mean electricity that would shock a person in touching it.

"A. Yes."

The representatives of the defendant gave no instructions or warnings as to the manner of inserting the two-pronged plug into the electrical outlet. Following is from the testimony of the salesmanager:

"Q. Did you give instructions to the salesmen to warn customers with respect to that plug-in?

"A. Most of our salesmen was familiar with electricity.

"Q. My question is did you give instructions to the salesmen personally?

"A. No.

"Q. With respect to the danger inherent in that?

"A. No.

"Q. Did anyone in your presence during that time instruct salesman that were selling driers of the danger inherent in that situation?

"A. No, sir."

The testimony reveals that the plaintiff was a farm worker and lived in a small house on the employer's farm. Plaintiff was without formal education and his wife had gone to school through the eighth grade. They had in their home an electric refrigerator, electric washing machine and small electrical kitchen appliances. They had never before owned an electric clothes drier. Plaintiff had never had any experience with electric driven machines and had never had occasion to ground an electric appliance. He testified that he had no knowledge about the danger of plugging in the drier one way as opposed to the other.

■ There is no evidence that the defendant instructed either the plaintiff or the decedent as to the manner in which the two-pronged plug should be inserted in the outlet or of the danger involved in plugging in the two-pronged plug in the wrong manner, absent the ground. Neither is there any evidence that the defendant warned either one of them of the danger involved in operating the drier without a ground. Defendant assumes that because plaintiff admitted that he knew the machine was supposed to be grounded, that he had full knowledge concerning the inherent danger of operating the drier without a ground, and that his act in permitting the decedent to so operate the drier constitutes an independent intervening cause which insulated the defendant from any legal liability. In the circumstances of this case the assumption goes too far. The extent of knowledge, if any, on the part of the plaintiff or decedent as to the inherent danger of the use of the ungrounded machine raised a question of fact for the jury to decide.

In its memorandum opinion granting the defendant's motion to have judgment entered in its favor, notwithstanding the verdict, it stated that the plaintiff's case established only that "defendant breached its contract by failure to ground the machine."

Plaintiff's complaint predicates defendant's liability only upon negligence of the defendant in the respects therein set forth. Such is also true in respect to plaintiff's contentions in the pretrial order. Defendant's answer denies negligence and asserts as an affirmative defense contributory negligence of the decedent. The same is true in respect to defendant's contentions in the pretrial order.

The cause was tried solely on the theories of negligence and contributory negligence.

The instructions given by the District Court to the jury were the customary

**259**

instructions usually given in a negligence case wherein the defendant, as affirmative defenses sets up contributory negligence and assumption of risk. The court informed the jury:

(a) That the plaintiff charged the defendant with negligence in the following particulars:

(1) In preventing the plaintiff from grounding the appliance by telling him that the warranty upon said appliance would not be applicable if he were to ground the drier himself; and

(2) In failing to warn plaintiff or his wife of the danger inherent in operating said drier without a ground, especially in view of its installed location;

(3) In failing to instruct plaintiff or his wife as to the proper manner of plugging in the drier in electrical outlets.

(b) That the defendant charged the decedent was negligent in the following particulars:

(1) In having the electric drier installed in the immediate proximity of a bathtub, with the vent pipe over a portion of the tub;

(2) In coming in contact with said electric drier at a time when she was immersed in water in the tub;

(3) In operating said electric drier when she knew, or should have known, that she was likely to receive an electric shock.

By verdict in favor of the plaintiff, the jury necessarily found as implied findings of fact:

(1) That the defendant was negligent in one or more of the particulars above described;

(2) That the decedent was free from contributory negligence in all of the particulars above stated; and

(3) That the decedent did not incur or assume the risk of her activity in the circumstances of the case.

In our view the duty resting upon the defendant in the context of this case was more than its contractual obligation to ground the machine. It was under a duty to warn the purchasers of the machine of the inherent danger, of which the defendant had knowledge, in using an ungrounded machine, which danger and defendant's corresponding duty to warn thereof was increased by the fact that the machine could be operated, ungrounded, without danger, if the two-pronged plug were inserted in the wall in one way, while inserted another way the machine became a "death trap", as to which defendant had knowledge and should have foreseen.

It is our view that the District Court erred in holding that plaintiff's case established only a breach of contract on the part of the defendant. In the Oregon case of Harper v. Interstate Brewery Co., 168 Or. 26, 120 P.2d 757 (1942), the Supreme Court stated at page 762:

"We shall first explore the law relative to defendants' contention that plaintiff's case rests solely upon breach of contract and that therefore tort will not lie. It may be stated as a general rule that a mere breach of contract does not constitute a tort nor authorize an action on the case.

" 'The Distinction between a Tort and a Breach of Contract is broad and clear, in theory. In practice, however, it is not always easy to determine whether a particular act or course of conduct subjects the wrongdoer to an action in tort, or merely to one for a breach of contract. The test to be applied is the nature of the right which has been invaded. If this right was created solely by the agreement of the parties, the plaintiff is limited to an action ex contractu. If it was created by law he may sue in tort.' Burdick's Law of Torts, 4th Ed., Page 46.

"The same author quotes with approval from Chief Justice Tindal in the leading case of Boorman v. Brown, 3 Q.B. (Ad. v. E.N.S.) 511 (1842), affirmed in the House of

Lords, 11 Cl. & F. 1 (1844), as follows: ' * * * That there is a large number of cases in which the foundation of the action springs out of privity of contract between the parties, but in which, nevertheless, the remedy for the breach or non-performance is indifferently either assumpsit, or case upon tort, is not disputed. Such are actions against attorneys, surgeons, and other professional men, for want of competent skill or proper care in the service they undertake to render; actions against common carriers, against shipowners on bills of lading, against bailees of different descriptions; and numerous other instances occur in which the action is brought in tort or contract, at the election of the plaintiff.' Burdick's Law of Torts, 4th Ed., p. 10.

"Defendants rely upon the following excerpts from Corpus Juris: '* * * It is a distinguishing characteristic of torts that the duties from the violation of which they result are creatures of the law and not of particular agreements. As contractual duties proper have their origin in, and derive their vitality directly from, the assent of the parties, a breach of such duties only does not constitute a tort.' 62 C.J. 1091, 1092, § 2.

"However in the same treatise it is said: ' * * * causes of action need not be completely disconnected from contracts in order to constitute torts. Indeed, the existence of a contract may be one of the circumstances requisite to give to particular conduct the character of a breach of duty and thus to make it tortious.' 62 C.J. 1093, § 3.

"' * * * But where there is a breach of duty imposed by the law apart from any consent of the person owing the duty, and the remedy claimed is not the payment of a definite sum of money but pecuniary compensation for the injury, then we have a wrong independent of contract which gives rise to an action of tort.' Clerk & Lindsell on Torts, 7th Ed., p. 1.

"Thus it may be necessary for a plaintiff to show a contract between himself and the defendant in order to establish that the defendant has assumed a position, relationship or status upon which the general law predicates a duty independent of the terms of the contract but it does not necessarily follow that his only remedy is ex contractu. If from the position, contractually assumed, a duty be raised independent of the contract an action in tort may lie."

See also 86 C.J.S. Torts § 3, page 924.

In the same memorandum opinion it is stated: "That it was as much a part of the contract that the plaintiff and his wife would not use the machine as it was that the defendant would properly ground it", and that " * * * decedent was negligent as a matter of law in using the ungrounded machine." Our examination of the entire record forces us to conclude that the evidence was insufficient for the District Court to declare, as a matter of law, that plaintiff and his wife contracted not to use the machine until the defendant had grounded the same. We are also of the view that the evidence and the reasonable inferences to be drawn therefrom are such that the plea of contributory negligence presented a fact question for the jury to decide.

The fact questions in this case were presented to the jury for decision under proper instruction. The implied findings of fact of the jury are supported by substantial evidence when viewed in the light most favorable to support the verdict. In our judgment the District Court erred in entering judgment in favor of the defendant notwithstanding the jury's verdict in favor of the plaintiff.

Included in defendant's motion that judgment be entered in its favor notwithstanding the verdict, defendant moved the District Court in the alternative

for an order setting aside the verdict and any judgment entered thereon, and granting a new trial upon the grounds and for the reasons stated in such alternate motion. The District Court, as above indicated, granted defendant's motion for judgment in its favor notwithstanding the verdict and denied defendant's alternate motion for a new trial. While defendant did not file a cross appeal, it did designate as additional record on appeal its motion for a new trial and its requested instructions numbered 6 and 15, and such designations are included in the record on appeal.

In its brief defendant assigns as error the order of the District Court in denying its motion for new trial in the event this court should conclude the District Court erred in granting judgment in its favor notwithstanding the verdict. No assignment of error appears in defendant's brief in respect to the refusal of the trial court to give proffered instructions numbered 6 and 15.

Plaintiff contends that we are precluded from considering the District Court's order in denying defendant's motion for new trial because defendant filed no cross appeal from such order. We do not agree. It is our view that in a situation where a trial court grants a judgment notwithstanding the verdict and denies a motion for new trial, the appellee need not cross appeal in order to obtain review of the order denying the motion for new trial. In Montgomery Ward & Company v. Duncan, 311 U.S. 243, 254, 61 S.Ct. 189, 85 L.Ed. 147, the court said of such a situation:

> " * * *, we see no reason why the appellee may not, and should not, cross-assign error, in the appellant's appeal, to rulings of law at the trial, * * *."

See also 5 Moore's Federal Practice, § 50.15, pp. 2348–2350, and 1962 Cumulative Supplement § 50.15, p. 146.

We have reviewed defendant's assigned error that the District Court erred in denying defendant's motion for new trial. The grounds set forth in the motion are substantially the same as those which we have decided adversely to defendant's contentions in holding that the District Court erred in granting defendant's motion for judgment notwithstanding the verdict. We find no merit in defendant's assigned error.

The judgment appealed from is reversed.