LAWRENCE J. SCHIPPER, II, A MINOR, BY HIS FATHER AND GUARDIAN *AD LITEM*, LAWRENCE J. SCHIPPER, AND LAWRENCE J. SCHIPPER IN HIS OWN RIGHT, PLAINTIFFS-APPELLANTS, v. LEVITT & SONS, INCORPORATED, A CORPORATION OF THE STATE OF NEW YORK, AND YORK SHIPLEY, INC., A CORPORATION OF THE STATE OF DELAWARE, DEFENDANTS-RESPONDENTS, AND LAWRENCE J. SCHIPPER, II, A MINOR, BY HIS FATHER AND GUARDIAN *AD LITEM*, LAWRENCE J. SCHIPPER, AND LAWRENCE J. SCHIPPER, IN HIS OWN RIGHT, PLAINTIFFS-APPELLANTS, v. BUILDERS SUPPLY CORPORATION, A CORPORATION OF NEW JERSEY, DEFENDANT, THIRD-PARTY PLAINTIFF, RESPONDENT, v. YORK SHIPLEY, INC., A CORPORATION OF THE STATE OF DELAWARE, THIRD-PARTY DEFENDANT, FOURTH-PARTY PLAINTIFF, RESPONDENT, v. LEVITT & SONS, INCORPORATED, A CORPORATION OF THE STATE OF NEW YORK, FOURTH-PARTY DEFENDANT-RESPONDENT.

Argued December 1, 1964—Decided February 19, 1965.

72

*Mr. Thomas F. Connery, Jr.* argued the cause for the appellants (*Messrs. Brown, Connery, Kulp & Wille,* attorneys; *Mr. Joseph H. Rodriguez,* on the brief).

*Mr. Samuel P. Orlando* argued the cause for the respondent Levitt & Sons, Incorporated.

*Mr. Peter J. Devine, Jr.* argued the cause for the respondent York Shipley, Inc. (*Messrs. Kisselman, Devine, Deighan & Montano,* attorneys; *Mr. Michael Patrick King,* on the brief).

*Mr. Herbert Horn* argued the cause for the respondent Builders Supply Corporation (*Messrs. Lloyd, Horn, Megargee & Steedle,* attorneys).

The opinion of the court was delivered by

JACOBS, J. The plaintiffs sued for damages suffered as a result of the severe scalding received by the infant plaintiff

Lawrence J. Schipper, II when he came in contact with excessively hot water drawn from the faucet in the bathroom sink. The trial court dismissed the proceeding at the close of the plaintiffs' case. They appealed to the Appellate Division and we certified before argument there.

The defendant Levitt & Sons, Inc. is a well-known mass developer of homes, specializing in planned communities. Its homes are generally sold on the basis of advertised models constructed in accordance with Levitt's specifications. One of its communities is at Levittown (now known as Willingboro), New Jersey, where it built thousands of homes, including the home at 81 Shawmont Lane purchased in 1958 by the Kreitzers. This home was evidently built for the Kreitzers after they had selected a model, for Mrs. Kreitzer testified that "we watched the complete building of our home as it was going up." The Kreitzers moved in during November 1958 and received a "Homeowner's Guide" from Levitt which contained a message of welcome to Levittown and various informational items. Under the caption "Heating System" it advised that the "system consists of a gas-fired boiler supplying heating coils imbedded in the concrete floor beneath the tile" and that "as heated water is pumped through these heating coils, the coils warm the concrete in which they are imbedded and the entire floor becomes warm." There was a cautionary note against any attempts at "adjustments" of the heating unit and instructions to call Public Service Electric and Gas Company "for emergency service." Under the caption "Hot Water," the Homeowner's Guide had the following to say:

"You will find the hot water in your Levittown home much hotter than that to which you are accustomed. Hot water such as this is desirable for clothes washing as well as other uses.

We have provided at each fixture, mixing type faucets so that you adjust the water temperature to suit. The proper procedure at any faucet is to first open the cold water tap part way, and then turn on the hot water. This avoids wasting hot water and yields properly tempered water for bathing and dishwashing."

Mr. Kreitzer testified that he found the domestic hot water to be really hot and that he was burned on several occasions. He complained to Levitt's representatives but was told that they could not reduce the temperature except through "the installation of a mixing valve" in the heating unit. Mr. Kreitzer also complained to the Public Service representatives but they told him that they could make no significant reduction in the temperature of the water. Mrs. Kreitzer testified that the water "was exceptionally hot coming out of the bathroom faucets." She was burned mildly on several occasions and a house guest was "burned pretty badly" when she "didn't have a chance to warn her." Thereafter Mrs. Kreitzer put a handwritten note in the bathroom reading: "Caution. Water Hot. Turn on cold water first." She did not recall whether the note was in the bathroom when the Kreitzers leased their house to the Schippers.

The plaintiff Mr. Lawrence J. Schipper testified that in July 1960 he leased the house at 81 Shawmont Lane from the Kreitzers for a term of one year. He did not recall that his lessors had mentioned anything about the hot water and he did not read the Homeowner's Guide until after the scalding of his son Lawrence J. Schipper, II. When he and his family moved in on August 13, 1960, he turned on the control switch in the closet which contained the gas-fired heating unit and waited for the gas to "cycle through." He then tried the hot water faucet in the bathroom adjacent to the closet and noticed that the water coming from the tap "gave a sort of spitting noise and seemed to be a mixture of gas and steam." He examined the heating unit to see whether it had any mechanism to control the temperature of the water and found none. He cautioned his wife and children that the water was "extremely hot" and that they would have to be careful until he "could find a means of regulating it." He spoke to the realtor through whom he had negotiated his lease and, on the realtor's recommendation, he decided to call Public Service on Monday morning August 15th when he "next expected their services to be available." He did call Public Service at

about 8:30 on Monday morning and, in response, its representative made a service call later that morning but found the heating unit to be operating in normal fashion and could make no adjustment which would appreciably affect the temperature of the domestic hot water.

During the morning of August 15th and apparently before the Public Service representative had arrived, the scalding of the infant plaintiff (Larry), who was then sixteen months old, had occurred. Mrs. Schipper testified that she was upstairs when she heard Larry crying. She came downstairs, heard the water running, found the hot water faucet in the bathroom sink turned on, and realized that Larry had been scalded. He was taken immediately to the doctor's office and then to the Cherry Hill hospital where he remained for seventy-four days. Thereafter he was hospitalized on three separate occasions and during two of these, skin grafting operations were performed.

In 1961 the plaintiffs filed a complaint against Levitt & Sons, Inc. and York Shipley, Inc., the company which manufactured the heating unit, and another complaint against Builders Supply Corporation, Levitt's wholly owned subsidiary which had purchased the heating unit from York. Thereafter the matters were consolidated and amendments and other pleadings were duly filed. The plaintiffs charged that, in the construction of the Levittown homes, Levitt had directed and ordered the installation of a gas-fired hot water boiler and water distribution system which was so defectively designed and equipped "that it produced without notice or warning scalding hot water at a temperature that was dangerously high for ordinary domestic use" and that it "knew or should have known of the highly dangerous condition created by it, which involved an unreasonable risk of bodily harm to children of immature years and others, who had no means of discovering the condition or realizing the risks." Similarly, the plaintiffs charged that York had manufactured the improperly designed system and that it knew or should have known of the highly dangerous condition created by it which

involved unreasonable risk of harm. The plaintiffs sought damages from Levitt and its wholly owned subsidiary Builders Supply and from York for the injuries sustained by the infant plaintiff as the result of his scalding and also sought consequential damages suffered by his father Lawrence J. Schipper.

In support of their complaints, the plaintiffs introduced expert and other testimony which dealt extensively with the installation and operation of the heating and hot water system. Mr. Witt testified that he was an experienced mechanical engineer, had been employed by Levitt for nine years, and was responsible for the design of the heating and hot water system in the New Jersey Levittown homes as well as in Levittown homes elsewhere. He described the prime component of the system as a boiler manufactured by York to supply both hot water for heating and domestic purposes through the use of an instantaneous hot water coil immersed in the boiler. He recognized that the temperature of the water as it came from the boiler (at 190 degrees Fahrenheit and upward) would be excessively high for domestic use and that since the heating closet in the plaintiffs' home was only six feet away from the bathroom sink, the water coming from the hot water tap on initial draw would be almost at the same temperature as that in the boiler. He acknowledged that York had recommended that a mixing valve be installed at the outside of the boiler to avoid excessively hot water for domestic use and that Levitt had deliberately not followed the recommendation. Instead, Levitt had merely provided bathroom and sink fixtures which supplied hot and cold water through combination spigots and had cautioned purchasers in its Homeowner's Guide that the proper procedure at any faucet was first to open the cold tap part way and then turn on the hot water.

Mr. Snyder testified that he had been in the employ of York for fourteen years and was now the chief design engineer for "residential and Jackson & Church Products," a division of York. He was responsible for the design of York's heating units including those sold to Builders Supply for

installation in Levittown homes in New Jersey and elsewhere. He testified that several thousand units had been furnished for the New Jersey Levittown homes and that seventeen thousand units of similar design had been furnished for the Pennsylvania Levittown homes. He stated that the normal range for hot water which would come in contact with the person was around 140 degrees and he acknowledged that, on initial draw, water drawn from the boiler might be 190 degrees and higher. It was for this reason that his company strongly recommended to Levitt that it install "a mixing valve which would limit the temperature delivery to the faucets at 140 degrees." In fact, York recommended a particular valve known as Taco although "there are other makes on the market that are normally supplied through plumbing supply houses as a standard animal in the plumbing trade."

Mr. Snyder stated that all manufacturers recommend the use of this type of valve which is a marketed item "normally installed by the installer" and "not an inherent piece of the equipment." When asked why he considered the valve to be not inherently part of its heating unit, he testified that it is a normal trade item such as a circulator or thermostat and that it is unusual for an original heating equipment manufacturer to merchandise items of this type. He stressed that the mixing valve is normally applied to the unit at the time of installation, that "the valve itself has sweat fittings that are normally applied with heat and solder" to the exterior of the boiler, and that it "would not be practical in present known designs" to install the mixing valve in the original manufacture of the boiler.

Mr. Snyder stated further that his company buys mixing valves for about $3.60 each, that they probably retail at $9 or $10, and that they are not expensive to install. The plaintiff Lawrence J. Schipper testified that after the scalding of his son, he installed a mixing valve at a total cost of $18 for parts and labor. Mr. Lightner, administrative assistant to the president of York, testified that he had participated in the negotiations for the purchase and sale of the heating units,

that William Levitt of the Levitt organization represented it in the negotiations, and that ultimately the purchase order came from Builders Supply, Levitt's purchasing corporation. He estimated that two or three thousand units were sold for the Levittown homes in New Jersey and sixteen or seventeen thousand units for the Levittown homes in Pennsylvania. He stated that his company recommended the use of a mixing valve but that "Levitt was not interested in buying the mixing valve from us for either Pennsylvania or Jersey" although it had purchased mixing valves for its homes at Levittown, Long Island.

Three engineers who testified as experts for the plaintiffs all agreed that while temperatures ranging from 190 degrees and upward were necessary for house heating purposes, temperatures above 140 degrees for domestic purposes involving contacts with the person would be highly dangerous. They all referred to the mixing valve as one of the recognized devices for reducing the temperature of the domestic hot water to acceptable limits. Mr. Baccini testified that for this type of burner a mixing valve "can be either furnished with the unit or it is made available in a piping harness which is sold with the unit." He acknowledged that the plans set up by Levitt for its New Jersey homes did not call for any mixing valves and that Levitt could decide for itself whether to purchase heating units from any particular manufacturer without also purchasing mixing valves from him. Mr. Lerner testified that mixing valves are made by many companies and are available in plumbing supply houses, and that some manufacturers of tankless heaters such as those furnished by York will include mixing valves "as part of their package boiler" while "other manufacturers will not if they feel they don't know where the unit is going." He also testified that if the unit is to be installed in a home "engineering practice is definitely that a mixing valve must be on." When asked about the combination spigots which Levitt had installed, he testified that they were not "a substitute for a mixing valve in the line itself" but were simply used as a means of manually controlling tempera-

ture below the 140 degree acceptable standard. Professor Edgar testified that he would not accept the combination spigot as a substitute for the mixing valve and that he would consider it "highly unsafe" to have a unit which supplied hot water to the tap at a temperature ranging from 190 degrees upward.

After the plaintiffs had completed their presentation, the defendants moved for dismissal and their motions were granted. Insofar as Levitt was concerned, the trial court considered itself bound by the holdings in *Sarnicandro v. Lake Developers, Inc.*, 55 *N. J. Super.* 475 (*App. Div.* 1959), and *Levy v. C. Young Construction Co., Inc.*, 46 *N. J. Super.* 293 (*App. Div.* 1957), aff'd on other grounds 26 *N. J.* 330 (1958). In *Sarnicandro*, the court held that a builder vendor was not liable for injuries suffered by a lessee of the vendee when she fell on steps which had been improperly constructed by the builder vendor. In *Levy*, a divided Appellate Division held that a builder vendor was not liable to the purchaser for damages resulting from latent defects "in the absence of express warranties in the deed or fraud or concealment." In dealing with Builders Supply, the trial court described it as an *alter ego* of Levitt and said that it could find no evidence that it had violated any duty "either by way of negligence or by way of breach of warranty" which it owed to the plaintiffs or others. And in dealing with York it said that it could find no evidence of "any duty to the plaintiffs" or for that matter to anyone else concerned.

██ Under the first point in their brief the plaintiffs contend that Levitt should be liable for "negligence causing injury to the infant plaintiff." They point out that Levitt was not just an ordinary vendor of a house but was "also the architect, the engineer, the planner, the designer, the builder and the contractor." Under the proofs, the decision to install the hot water distribution system without a mixing valve was a deliberate one by Levitt in disregard of York's explicit recommendation to the contrary. The common spigots installed by Levitt were no substitute for the mixing valve and the

cautionary instruction in the Homeowner's Guide was insufficient to advise of the serious dangers attendant upon bodily contact with the water heated to 190–210 degrees. Furthermore, it was entirely foreseeable that the Guide would never come to the attention of many persons who would come in contact with the heated water such as invited guests, and indeed the infant plaintiff himself. See *Prosser, Torts* § 96, at *p.* 665 (*3d ed.* 1964). If ordinary negligence principles are applied, it may readily be found that in view of the likelihood and gravity of the danger and the ease with which it could have been avoided, Levitt had failed to exercise reasonable care in the design and installation to avoid unreasonable risk of harm. See 2 *Harper and James, Torts* § 28.3 (1956). The fact that Messrs. Kreitzer and Schipper may have known of the dangerous condition would not, as a matter of law, preclude a finding of negligence; *Harper and James, supra,* § 28.5, at *p.* 1543 have put it this way:

"Today, however, the negligence principle has been widely accepted in products liability cases; and the bottom does not logically drop out of a negligence case against the maker when it is shown that the purchaser knew of the dangerous condition. Thus if the product is a carrot-topping machine with exposed moving parts, or an electric clothes wringer dangerous to the limbs of the operator, and if it would be feasible for the maker of the product to install a guard or a safety release, it should be a question for the jury whether reasonable care demanded such a precaution, though its absence is obvious. Surely reasonable men might find here a great danger, even to one who knew the condition; and since it was so readily avoidable they might find the maker negligent. Under this analysis the obviousness of a condition will still preclude liability if the obviousness justifies the conclusion that the condition is not unreasonably dangerous; otherwise it would simply be a factor to consider on the issue of negligence."

See also Noel, "Manufacturer's Negligence of Design or Directions for Use of a Product," 71 *Yale L. J.* 816, 836–841 (1962); 1 *Frumer and Friedman, Products Liability* § 7.02, at *pp.* 114–115 (1964); Note, 28 *Fordham L. Rev.* 776, 779 (1960); *cf. Harp v. Montgomery Ward & Co.,* 336 *F. 2d* 255, 258 (9 *Cir.* 1964); *Crane v. Sears Roebuck & Co.,* 218 *Cal.*

*App. 2d 855, 32 Cal. Rptr. 754, 756 (D. C. App. 1963);
Varas v. Barco Manufacturing Company, 205 Cal. App. 2d
246, 22 Cal. Rptr. 737, 747 (D. C. App. 1962).*

██ In fulfillment of the deliberate design of its system
for distributing hot water for domestic use, Levitt assembled
the ingredients, including the heating unit from York, and
directed their installation. In this respect it was not unlike
the manufacturers of automobiles, airplanes, etc., whose prod-
ucts embody parts supplied by others. When their marketed
products are defective and cause injury to either immediate
or remote users, such manufacturers may be held accountable
under ordinary negligence principles (*MacPherson v. Buick
Motor Co.,* 217 N. Y. 382, 111 N. E. 1050 (*Ct. App.* 1916))
as well as under expanding principles of warranty or strict
liability. See *Henningsen v. Bloomfield Motors, Inc.,* 32 N. J.
358 (1960); *Putman v. Erie City Manufacturing Company,*
338 F. 2d 911 (5 Cir. 1964); *Goldberg v. Kollsman Instru-
ment Corporation,* 12 N. Y. 2d 432, 240 N. Y. S. 2d 592, 191
N. E. 2d 81 (*Ct. App.* 1963); *Greenman v. Yuba Power
Products, Inc.,* 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 P. 2d
897 (*Sup. Ct.* 1962); cf. *Santor v. A & M Karagheusian,
Inc.,* 44 N. J. 52 (1965). The plaintiffs urge that the *Mac-
Pherson* principle, imposing liability for negligence, should be
applied to a builder vendor such as Levitt. We consider their
point to be well taken for it is clear to us that the impelling
policy considerations which led to *MacPherson* and its imple-
mentations are equally applicable here. See *Foley v. Pitts-
burgh-Des Moines Co.,* 363 Pa. 1, 68 A. 2d 517, 533 (*Sup.
Ct.* 1949); *Dow v. Holly Manufacturing Company,* 49 Cal.
2d 720, 321 P. 2d 736 (*Sup. Ct.* 1958); *Fisher v. Simon,* 15
Wis. 2d 207, 112 N. W. 2d 705 (*Sup. Ct.* 1961); *Leigh v.
Wadsworth,* 361 P. 2d 849 (*Okla. Sup. Ct.* 1961); cf. *Inman
v. Binghamton Housing Authority,* 1 A. D. 2d 559, 152
N. Y. S. 2d 79 (1956), rev'd 3 N. Y. 2d 137, 164 N. Y. S. 2d
699, 143 N. E. 2d 895, 898–899 (*Ct. App.* 1957); *Pastorelli
v. Associated Engineers, Inc.,* 176 F. Supp. 159, 164 (D. R. I.
1959); *Caporaletti v. A-F Corporation,* 137 F. Supp. 14

(*D. D. C.* 1956), rev'd 99 *U. S. App. D. C.* 367, 240 *F. 2d* 53 (*D. C. Cir.* 1957); *Prosser, supra,* § 99, at *p.* 695.

In *Dow* a general contractor prepared plans and specifications and built a house for Muth. A heating unit was installed and later proved defective causing deaths in the Dow family, a subsequent purchaser. The California Supreme Court, applying *MacPherson,* held the general contractor liable for the consequences of his negligence. In the course of its opinion, it pointed out that although formerly the requirement of privity would have precluded the action, that requirement has been done away and it cited the references in Dean Prosser's second edition to decisions which had placed building contractors on the same footing as sellers of goods, and had held them to the general standard of reasonable care for the protection of anyone who might foreseeably be endangered by their negligence, even after acceptance of the work. *Prosser, Torts* § 85, at *p.* 517 (*2d ed.* 1955). In Dean Prosser's more recent edition he noted that the reasons which had earlier been advanced against holding general contractors liable in negligence actions by third persons were reminiscent of those which had been advanced in actions against manufacturers of goods and had been rejected in *MacPherson;* and he concluded that the earlier approach is now in full retreat and that the majority rule now imposes responsibility to third persons for negligence "not only as to contractors doing original construction work, but also as to those doing repair work or installing parts, as well as supervising engineers and architects." *Prosser, supra,* at *p.* 695 (*3d ed.* 1964).

In *Inman* the infant plaintiff was injured when he fell from a stoop having no railing or other protective device around it. The plaintiffs sued the builder and architect, along with others, alleging that the architect had designed a dangerously defective stoop and that the builder had erected it. The Appellate Division of the New York Supreme Court held that *MacPherson* was applicable and that the complaint set forth a cause of action. In the course of its opinion, it expressed the thought that there was no valid reason for any

distinction between real and personal property so far as the principle of liability is concerned; that the arguments for and against liability are almost precisely the same in each instance; and that the trend of modern scholarship sustains the view that "no cogent reason exists for continuing the distinction." 152 *N. Y. S. 2d,* at *p.* 83. On appeal, the Court of Appeals agreed that *MacPherson* was applicable and that " 'there is no visible reason for any distinction between the liability of one who supplies a chattel and one who erects a structure' (*Prosser on Torts* [*2d ed.* 1955], § 85, *p.* 517)." 164 *N. Y. S. 2d,* at *p.* 703, 143 *N. E. 2d,* at *p.* 898; see *Pastorelli v. Associated Engineers, Inc., supra,* 176 *F. Supp.,* at *p.* 164. However, it reversed because the plaintiffs' complaint contained "no allegation of any latent defect or concealed danger." 164 *N. Y. S. 2d,* at *p.* 704, 143 *N. E. 2d,* at *p.* 899. This requirement has been the subject of critical comments which soundly point out that dangers may be unappreciated though patent and risks may be unreasonable though unconcealed. See *Harper and James, supra,* § 28.5, at *pp.* 1542– 1546; Noel, *supra,* 71 *Yale L. J.,* at *pp.* 836–841; 1 *Frumer and Friedman, supra,* § 7.02, at *pp.* 114–115; Clark, J., dissenting in *Messina v. Clark Equipment Company,* 263 *F. 2d* 291, 293 (2 *Cir.* 1959). Professor Noel has noted that a definite requirement that the defect or danger be latent would appear to be a reversion to the earlier concept that the chattel must be inherently dangerous whereas now the accepted concept is that the creation of any unreasonable danger is enough to establish negligence; and he has taken the approach set forth in *Harper and James* that "even though the absence of a particular safety precaution is obvious, there ordinarily would be a question for the jury as to whether or not a failure to install the device creates an unreasonable risk." 71 *Yale L. J.,* at *p.* 838.

In *Leigh* the court applied *MacPherson* to a builder vendor who had constructed inexpensive houses in Stillwater, Oklahoma and had sold them to various purchasers. One of the purchasers sold his house to a person who leased it to the

plaintiff. The roof of the porch fell on the plaintiff causing injuries for which she sought damages from the builder vendor. The defendant advanced various points including the contention that it owed no duty to the plaintiff and she could not charge him with negligence "because of a lack of privity." All of its points were rejected by the Oklahoma Supreme Court which sustained a jury verdict for the plaintiff. In its opinion it cited the annotation in 58 *A. L. R. 2d* 865, 891 (1958) and placed reliance on the many cases there set forth which have in recent years applied ordinary negligence principles to allow recovery in actions by third persons against building contractors. 361 *P. 2d,* at *p.* 852.

In *Fisher* the plaintiffs purchased a house which the defendant builder vendor had newly constructed for sale. After the plaintiffs had occupied the house for a year the basement floor cracked permitting seepage which caused damage and required repair. Charging negligent construction, the plaintiffs sued and obtained a judgment against the defendant. On appeal, the Wisconsin Supreme Court affirmed, holding that the defendant builder vendor was under a duty to exercise ordinary care in the construction of the building and that acceptance of title by the vendees did not preclude their subsequent negligence action. The court referred approvingly to the modern trend towards holding building contractors liable for their negligent construction even where the injuries occur after completion of the work and its acceptance by the owner; and it referred disapprovingly to the Appellate Division's opinion in *Levy v. C. Young Construction Co., Inc., supra,* 46 *N. J. Super.* 293. In *Levy* there was a suggestion that real estate transactions would become chaotic if vendors were subjected to liability after they had parted with ownership and control of the premises. 46 *N. J. Super.,* at *p.* 297. The Wisconsin court considered this reasoning to be wholly unconvincing, at least when applied to a builder vendor such as the defendant there or Levitt here; it properly noted that if the same reasoning were applied in products liability cases generally, manufacturers of chattels would not be held liable

for negligently made articles and *MacPherson* would not be settled law. 112 *N. W. 2d*, at *p.* 710; see 1963 *Wis. L. Rev.* 343. It is worthy of mention that a dissenting judge in *Levy* would have held the defendant builder vendor liable for injuries resulting from breach of an implied representation that the house was constructed in a proper and reasonably workmanlike manner (46 *N. J. Super.*, at *p.* 298) and that, on appeal, this Court explicitly declined to adopt any of the reasoning of the majority below but affirmed on the factual finding that no negligent or defective construction had been proved. 26 *N. J.*, at *p.* 334. See 12 *Rutgers L. Rev.* 529 (1958); Pinsky, "Real Property," 15 *Rutgers L. Rev.* 276, 300 (1961).

In *Sarnicandro v. Lake Developers, Inc., supra,* 55 *N. J. Super.* 475, the defendant builder vendor constructed a house and sold it. After the vendees took possession they complained about defective cellar steps but the defendant did nothing about the matter. Later a lessee of the vendees was injured on the steps and instituted an action grounded in negligence. Her action was dismissed and this was affirmed by the Appellate Division in an opinion which adhered to the ancient doctrine that, apart from certain highly restricted exceptions, a vendor is immune from liability, though a dangerous condition existing at the transfer of title later causes injury to the vendee or a third person. 55 *N. J. Super.*, at *p.* 479. Although the Appellate Division expressed its awareness of the well reasoned academic writings on the subject and the substantial measure of logical support for extension of *MacPherson* to realty transactions (55 *N. J. Super.*, at *p.* 480), it did not seek to make any differentiation between ordinary vendors and mass builder vendors, as the defendant there and Levitt here, nor did it make any reference to the cited decisions which have held general contractors and builder vendors liable to third persons for injuries resulting from negligent construction. The Appellate Division concluded its opinion with the thought that a vendor would be unlikely to continue his liability insurance coverage after

the sale of his house and that this might be viewed as a practical consideration against continuance of his liability. 55 *N. J. Super.*, at *p.* 484. Whatever bearing this might have when dealing with solitary vendors, it has clearly none when dealing with mass builder vendors. There is presumably available to such modern entrepreneurs, as there is in the products liability field generally (7A *Appleman, Insurance Law & Practice* § 45.08 (1962)), wholly adequate extended insurance coverage and the builder vendors are admittedly in much better economic position than the injured party to absorb crippling losses caused by their own negligent or defective construction.

Levitt contends that even if the *MacPherson* principles are applicable, the evidence here presented no jury question as to negligence and it rests heavily on the *Inman* requirement of latency. Earlier in this opinion, we questioned that requirement and indicated our support of the position that the obviousness of a danger does not necessarily preclude a jury finding of unreasonable risk and negligence; in any event the danger here was not patent in the sense of *Inman* or in the sense of the reference in Levitt's brief to the potential sources of danger to children which may be found in all homes, "ranging from stoves and ovens to electrical appliances, stairways, second-story windows and porches without railings." Those dangers are generally incident to normal living, they generally create no unreasonable risks, and there are admittedly no obligations on builder vendors to make their houses danger-proof or fool-proof. However, here the hot water faucet had a special and concealed danger far beyond any danger incident to contact with normally hot water; certainly no one, whether he be adult or child, would have suspected from its appearance that the water drawn from it would be at the dangerously high temperature of 190–210 degrees. Even the Homeowner's Guide gave no true indication of the serious scope of the danger when it simply described the water as much hotter than customary.

While the evidence may indicate that Messrs. Kreitzer and Schipper had become aware of the absence of a mixing valve, they may not have fully appreciated the extraordinary nature of the risk and, in any event, any omissions or contributory fault on their part would not preclude a finding that Levitt had been negligent and was to be held responsible to others who foreseeably might be injured as a result of its negligence. On the issue of negligence there was clearly enough evidence to go to the jury. Levitt knew that if the hot water faucet in the bathroom sink was first turned on, as it predictably might be, the water on initial draw would be at a dangerously high temperature; and it must have known that its warning about the water being much hotter than customary would from time to time be ineffective, either because of unawareness or forgetfulness. It could easily and at negligible cost have totally avoided the danger by installing a mixing valve. Despite specific recommendation that it do so, it deliberately chose to rely on ordinary combination spigots and the remarks in its Homeowner's Guide. Surely it could rightly and reasonably be found from all this that Levitt had subjected its vendees and their lessees, along with their families and guests, to unreasonable risk of harm and should, in all justice, be held accountable for the damages resulting from its negligence.

Under the second point in their brief, the plaintiffs contend that Levitt should be held liable "for a breach of warranty of habitability where a dangerous condition causes injury to a subsequent occupant." They point to the developing law in the products liability field; that law has moved from *MacPherson* (217 *N. Y.* 382, 111 *N. E.* 1050 (1916)), where negligence principles were applied to sustain liability, to *Henningsen* (32 *N. J.* 358 (1960)), where a breach of an implied warranty of merchantability was the basis for holding Chrysler liable for injury caused by a defective automobile, to *Santor* (44 *N. J.* 52 (1965)), where strict liability was applied to hold the manufacturer of a defective rug liable to a customer who purchased it from a retail dealer.

The plaintiffs acknowledge that in the realty field there has thus far been no comparable movement in our State, but they suggest that it may no longer justly be put off since there is, in today's society, no reason for differentiating mass sales of homes from advertised models, as in the Levitt operation, from mass sales of automobiles from advertised models, as in the Chrysler operation.

Law as an instrument for justice has infinite capacity for growth to meet changing needs and mores; nowhere was this better illustrated than in *Henningsen*. There a Plymouth automobile with a defective steering mechanism was sold by Chrysler to one of its dealers who in turn sold it to Mr. Henningsen. While the car was being driven by Mrs. Henningsen, its steering mechanism failed causing serious accident and severe injury. The Henningsens sued the Chrysler Corporation claiming that it had impliedly warranted that when it delivered its automobile it was not defective but was reasonably fit for its intended use; that this warranty had been breached, foreseeably causing injury to an ultimate user of the automobile, and that it should be held strictly responsible for the injury caused by its breach without further showing of fault or negligence. Their claim was sustained in a comprehensive opinion by Justice Francis which, after contrasting modern mass sales and marketing practices with those of an earlier day when privity and other restrictive requirements were in vogue, stressed the modern policy considerations which justly dictate that the loss be borne by the responsible manufacturer who placed the dangerous article in the stream of commerce.

Prior to *Henningsen* many courts had applied its principles in food and drug cases, and as Justice Francis pointed out (32 *N. J.*, at *p.* 383), there was no rational doctrinal basis for differentiating those situations from a defective automobile. Indeed, the unwholesome food or impure drug might ordinarily harm the individual user himself whereas the defective automobile might ordinarily harm not only the user but many others as well. Subsequent to *Henningsen* the ques-

tion arose in *Santor* (44 *N. J.* 65) as to whether its principles were equally applicable where no personal injury had occurred and the sole claim was to recover the price paid for a defectively manufactured rug. In holding that they were, we pointed out that there is no sensible reason for differentiating here between personal injury and property damage claims. We noted that the manufacturer's responsibility to the ultimate consumer presents an ever growing problem which is properly being dealt with "step by step" and approved, in lieu of warranty terminology, the strict liability in tort terminology voiced in *Greenman v. Yuba Power Products, Inc., supra,* 59 *Cal. 2d* 57, 27 *Cal. Rptr.* 697, 377 *P. 2d* 897. In summary, we reaffirmed the sweeping implications of *Henningsen* and reasserted that, when a manufacturer presents his products for sale to the public he accompanies them with an implied representation that they are reasonably fit for the intended use, and he is subject to an enterprise liability, the purpose of which is to insure that the cost of injury or damage resulting from defective products "is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves." *Santor v. A & M Karagheusian, supra,* 44 *N. J.,* at *p.* 52.

The law should be based on current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping its common law principles abreast of the times. Ancient distinctions which make no sense in today's society and tend to discredit the law should be readily rejected as they were step by step in *Henningsen* and *Santor.* We consider that there are no meaningful distinctions between Levitt's mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same. That being so, the warranty or strict liability principles of *Henningsen* and *Santor* should be carried over into the realty field, at least in the aspect dealt with here. Incidentally, recent reference to the sweep of Levitt's mass produc-

tion approach may be found in the July 1963 issue of *American Builder*, at *pages 42–45* where the president of Levitt, in response to an inquiry as to whether its policy of "no changes" would be applied in the building of its more expensive homes at Long Island, had this to say: "We intend to hold to our mass production approach in Long Island. People buy Cadillacs, don't they, and they're mass produced." See 12 *Rutgers L. Rev.* 529, 532 (1958).

When a vendee buys a development house from an advertised model, as in a Levitt or in a comparable project, he clearly relies on the skill of the developer and on its implied representation that the house will be erected in reasonably workmanlike manner and will be reasonably fit for habitation. He has no architect or other professional adviser of his own, he has no real competency to inspect on his own, his actual examination is, in the nature of things, largely superficial, and his opportunity for obtaining meaningful protective changes in the conveyancing documents prepared by the builder vendor is negligible. If there is improper construction such as a defective heating system or a defective ceiling, stairway and the like, the well-being of the vendee and others is seriously endangered and serious injury is foreseeable. The public interest dictates that if such injury does result from the defective construction, its cost should be borne by the responsible developer who created the danger and who is in the better economic position to bear the loss rather than by the injured party who justifiably relied on the developer's skill and implied representation.

The arguments advanced by Levitt in opposition to the application of warranty or strict liability principles appear to us to lack substantial merit. Thus its contention that *caveat emptor* should be applied and the deed viewed as embodying all the rights and responsibilities of the parties disregards the realities of the situation. *Caveat emptor* developed when the buyer and seller were in an equal bargaining position and they could readily be expected to protect themselves in the deed. Buyers of mass produced development homes are not on an

equal footing with the builder vendors and are no more able to protect themselves in the deed than are automobile purchasers in a position to protect themselves in the bill of sale. Levitt expresses the fear of "uncertainty and chaos" if responsibility for defective construction is continued after the builder vendor's delivery of the deed and its loss of control of the premises, but we fail to see why this should be anticipated or why it should materialize any more than in the products liability field where there has been no such result.

Levitt contends that imposition of warranty or strict liability principles on developers would make them "virtual insurers of the safety of all who thereafter come upon the premises." That is not at all so, for the injured party would clearly have the burden of establishing that the house was defective when constructed and sold and that the defect proximately caused the injury. In determining whether the house was defective, the test admittedly would be reasonableness rather than perfection. As was pointed out in *Courtois v. General Motors Corp.,* 37 *N. J.* 525 (1962), the comparable warranty of merchantability in the sale of goods means only that the article is reasonably fit for the purpose for which it is sold and does not imply "absolute perfection." 37 *N. J.,* at *p.* 543. See *Jakubowski v. Minnesota Mining and Manufacturing,* 42 *N. J.* 177, 185 (1964). And as Professor Noel has indicated, though the imposition of warranty or strict liability principles to a case of defective design, as alleged against Levitt here, would render unnecessary any allegation of negligence as such, it would not remove the plaintiffs' burden of establishing that the design was "unreasonably dangerous" and proximately caused the injury. *Noel, supra,* 71 *Yale L. J.,* at *pp.* 877–878; see also Prosser, "The Assault Upon the Citadel (Strict Liability to the Consumer)," 69 *Yale L. J.* 1099, 1114 (1960).

Levitt relies on the traditional rule that warranties in the sale of real estate are not to be implied (4 *Williston, Contracts* § 926 *(Rev. ed.* 1936)) and seeks to distinguish recent out-of-state cases which have limited the rule or departed

from it. See *Carpenter v. Donohoe,* 388 *P. 2d* 399 (*Colo. Sup. Ct.* 1964); *Glisan v. Smolenske,* 387 *P. 2d* 260 (*Colo. Sup. Ct.* 1963); *Jones v. Gatewood,* 381 *P. 2d* 158 (*Okla. Sup. Ct.* 1963); *Weck v. A:M Sunrise Construction Co.,* 36 *Ill. App. 2d* 383, 184 *N. E. 2d* 728 (1962). See also *Hoye v. Century Builders, Inc.,* 52 *Wash. 2d* 830, 329 *P. 2d* 474 (*Sup. Ct.* 1958); *Miller v. Cannon Hill Estates, Ltd.,* [1931] 2 *K. B.* 113; Bearman, "Caveat Emptor in Sales of Realty—Recent Assaults upon the Rule," 14 *Vand. L. Rev.* 541, 543 (1961); Dunham, "Vendor's Obligation as to Fitness of Land for a Particular Purpose," 37 *Minn. L. Rev.* 108, 118 (1953); 51 *Ill. B. J.* 498 (1963); 5 *De Paul L. Rev.* 263 (1956); 4 *W. Res. L. Rev.* 357, 359 (1953). Whether or not the cases may be differentiated, they undoubtedly evidence the just stirrings elsewhere towards recognition of the need for imposing on builder vendors an implied obligation of reasonable workmanship and habitability which survives delivery of the deed.

In *Weck* the Illinois court dealt with the plaintiffs' claim for damages based on the breach of an implied warranty by the builder vendor that the house, then under construction and being purchased by the plaintiffs, would be built in workmanlike fashion. In sustaining the plaintiffs' claim, the court referred to the holdings in the leading English case of *Miller v. Cannon Hill Estates, Ltd., supra,* and the pertinent American cases, that a contract to purchase a house under construction carries with it an implied warranty of reasonable workmanship and habitability which survives the deed. 184 *N. E. 2d,* at *pp.* 731–734; *cf. Caparrelli v. Rolling Greens, Inc.,* 39 *N. J.* 585 (1963); *Weinberg v. Wilensky,* 26 *N. J. Super.* 301 (*App. Div.* 1953). The court also referred to Professor Dunham's summation of the recent cases as imposing on the builder vendor a duty, which continues beyond delivery of the deed, "to make the premises fit for the ordinary purposes for which the building is being constructed and if the sale is from a model there is a duty to make the building sold conform to

the model and to be reasonably fit for its ordinary purposes." Dunham, *supra*, 37 *Minn. L. Rev.*, at *p.* 125.

In *Carpenter* the purchaser sued the builder vendor for damages resulting from breach of an implied warranty of reasonable workmanship and habitability. The builder vendor contended that, since the house was already completed before the purchaser agreed to buy it, there was no implied warranty within the holdings of *Miller* and *Weck*. In rejecting this contention, the Colorado court said:

> "That a different rule should apply to the purchaser of a house which is near completion than would apply to one who purchases a new house seems incongruous. To say that the former may rely on an implied warranty and the latter cannot is recognizing a distinction without a reasonable basis for it. This is pointedly argued in an excellent article, 'Caveat Emptor in Sales of Realty—Recent Assaults upon the Rule,' by Bearman, 14 Vanderbilt Law Rev. 541 (1960–61.)
>
> We hold that the implied warranty doctrine is extended to include agreements between builder-vendors and purchasers for the sale of newly constructed buildings, completed at the time of contracting. There is an implied warranty that builder-vendors have complied with the building code of the area in which the structure is located. Where, as here, a home is the subject of sale, there are implied warranties that the home was built in workmanlike manner and is suitable for habitation." 388 *P.* 2*d*, at *p.* 402.

It is worthy of note that although the 1936 edition of *Williston, Contracts,* upon which Levitt places reliance, stated flatly that there are no implied warranties in the sale of real estate, the 1963 edition took quite a different approach. 7 *Williston, Contracts* §§ 926, 926A (3*d ed.* 1963). In this edition, Professor Jaeger pointed out that although the doctrine of *caveat emptor* is still broadly applied in the realty field, some courts have inclined towards making "an exception in the sale of new housing where the vendor is also the developer or contractor" since in such situation the purchaser "relies on the implied representation that the contractor possesses a reasonable amount of skill necessary for the erection of a house; and that the house will be fit for human dwelling." § 926A, at *p.* 810. In concluding his discussion of the subject, the author remarked that "it would be much better if this en-

lightened approach were generally adopted with respect to the sale of new houses for it would tend to discourage much of the sloppy work and jerry-building that has become perceptible over the years." § 926A, at *p.* 818; see also, *Dunham, supra,* 37 *Minn. L. Rev.,* at *p.* 125; *Bearman, supra,* 14 *Vand. L. Rev.,* at *pp.* 570–576; *cf. Caporaletti v. A-F Corporation, supra,* 137 *F. Supp.,* at *p.* 16.

It is true, as Levitt suggests, that cases such as *Carpenter* (388 *P. 2d* 399) involved direct actions by original vendees against their builder vendors and that consequently no questions of privity arose. But it seems hardly conceivable that a court recognizing the modern need for a vendee occupant's right to recover on principles of implied warranty or strict liability would revivify the requirement of privity, which is fast disappearing in the comparable products liability field, to preclude a similar right in other occupants likely to be injured by the builder vendor's default. Issues of notice, time limitation and measure of proof, which have not really been discussed in the briefs, would seem to be indistinguishable from those which have been arising in the products liability field and are there being dealt with by developing case law and occasional statutory enactment. See 1963 *Wis. L. Rev.* 343, 352; *Courtois v. General Motors Corp., supra,* 37 *N. J.* 525; *Jakubowski v. Minnesota Mining and Manufacturing, supra,* 42 *N. J.,* at *p.* 182; *Santor v. A & M Karagheusian, Inc., supra,* 44 *N. J.,* at *p.* 52. See also *Caparrelli v. Rolling Greens, Inc., supra,* 39 *N. J.,* at *pp.* 592–594.

In the case against Levitt we need not at this stage concern ourselves with these issues for, under the plaintiffs' proofs, the design was a deliberate one, its special danger was not observable on sight, specific notice and complaint with respect to it were brought early to Levitt's attention by the original vendee, injury foreseeably occurred later to an unaware member of a family which had leased the premises from the original vendee, and suit was instituted shortly after the injury. All in all, the time expiration from the original conveyance by Levitt to the date of suit was less than three years. We

are satisfied that, in the particular situation here, the plaintiffs may rely not only on the principles of negligence set forth under their first point but also on the implied warranty or strict liability principles set forth under their second point. We note, however, as indicated earlier in this opinion, that even under implied warranty or strict liability principles, the plaintiffs' burden still remains of establishing to the jury's satisfaction from all the circumstances that the design was unreasonably dangerous and proximately caused the injury. See Noel, *supra*, 71 *Yale L. J.*, at *pp.* 877–878; see also Prosser, *supra*, 69 *Yale L. J.*, at *p.* 1114.

Under the third point in their brief the plaintiffs contend that Builders Supply should be held liable for Levitt's negligence and breach of warranty and they quote from *Mueller v. Seaboard Commercial Corp.*, 5 *N. J.* 28 (1950), where reference is made to cases holding that the corporate cloak may in proper circumstances be disregarded in order to avoid injustice. 5 *N. J.*, at *pp.* 34–35. Here there is no indication that the corporate cloak is being used to achieve injustice and there is no showing of any reason for disregarding it. The allegedly dangerous design and installation was not that of the subsidiary corporation Builders Supply but was that of the parent corporation Levitt. So far as appears, Builders Supply simply acted as Levitt's purchasing agent, followed Levitt's orders, exercised no discretion of its own, and did not participate at all in the design and installation. There is no suggestion that there would be difficulty in obtaining satisfaction of any judgment rendered against Levitt nor is there reference to any practical purpose which would be served by continuing Builders Supply in this proceeding. The lower court's judgment of dismissal as to Builders Supply is sustained.

Under the final points in their brief the plaintiffs contend that, as the manufacturer of the heating unit, York should be held accountable under negligence and warranty or strict liability principles and they rely on both the *MacPherson* (217 *N. Y.* 382, 111 *N. E.* 1050) and *Henningsen* (32

N. J. 358) doctrines. But under the plaintiffs' proofs here it is Levitt rather than York which stands in a position comparable to the defendants in *MacPherson* and *Henningsen*. As did the automobile manufacturers in *MacPherson* and *Henningsen*, Levitt designed the system, assembled the parts and had them installed. See *Dow v. Holly Manufacturing Company, supra*, 321 *P. 2d*, at *pp*. 739–740. York did no assembling or installation at the Levittown houses but simply sold and delivered heating units which met Levitt's specifications. These heating units were not defective when they were delivered to Levitt and functioned strictly as they were intended to. The defect alleged by the plaintiffs arose not from the heating unit as such but from the later installation which did not include any mixing valve or other tempering device at the boiler. York had furnished suitable installation instructions which "strongly recommended that a mixing valve be installed between the hot and cold domestic water lines." Levitt deliberately disregarded York's recommendation and decided upon its own design and installation which included common spigots and cautionary remarks in the Homeowner's Guide. It is evident from the plaintiffs' proofs that neither Levitt nor anyone else placed any reliance on York's judgment or skill in connection with the over-all design of the system and its installation; that being so there would appear to be no sound basis for invoking principles of implied warranty or strict liability against York. See *Henningsen v. Bloomfield Motors, Inc., supra*, 32 *N. J.*, at *p*. 370; *N. J. S.* 12A:2–314, 315; see also *In re Belle-Moc, Inc.*, 182 *F. Supp.* 429, 435–436 (*D. Me.* 1960); 1 *Williston, Sales* §§ 234, 235 (*Rev. ed.* 1948).

In *Goldberg v. Kollsman Instrument Corporation, supra*, 12 *N. Y. 2d* 432, 240 *N. Y. S. 2d* 592, 191 *N. E. 2d* 81, the plaintiff's daughter, a passenger in an airplane, died as a result of its crash. Suit was instituted by the plaintiff as administratrix against the maker of the airplane, and against a company which supplied one of its component parts, for alleged breach of implied warranty of fitness. The court held

that previous New York decisions discarding the requirement of privity should be extended so as to hold the maker of the airplane accountable under warranty or strict liability principles to remote as well as immediate users. But it declined for the present to do the same with respect to the maker of the component part, pointing out that "adequate protection is provided for the passengers by casting in liability the airplane manufacturer which put into the market the completed aircraft." 240 *N. Y. S. 2d,* at *p.* 595, 191 *N. E. 2d,* at *p.* 83. Similarly here the plaintiffs have been afforded wholly adequate protection by the holding as against Levitt, the company which built and marketed the house with the allegedly defective design and installation. In any event, we believe that under the plaintiffs' own proofs it may not fairly be said that York had either breached any implied warranty, or had failed to give reasonably sufficient warning and direction, or had failed to exercise the measure of care required of it. See *Watts v. Bacon & Van Buskirk Glass Co.,* 18 *Ill. 2d* 226, 163 *N. E. 2d* 425, 428 *(Sup. Ct.* 1960·) ; *cf. Shaw v. Calgon, Inc.,* 35 *N. J. Super.* 319, 331–332 *(App. Div.* 1955) ; *Moschkau v. Sears, Roebuck and Company,* 282 *F. 2d* 878 *(7 Cir.* 1960) ; *Nishida v. E. I. DuPont De Nemours & Company,* 245 *F. 2d* 768, 773 *(5 Cir.* 1957), *cert.* denied 355 *U. S.* 915, 78 *S. Ct.* 342, 2 *L. Ed. 2d* 275 (1958).

It must be borne in mind that York was dealing with Levitt as a highly responsible development company which had extensive experience in the field and which had selected York's heating units for installation in its development houses. Those units were standard in the trade as were the separate mixing valves which were obtainable either from York or from plumbing supply houses generally. According to the testimony, it would not have been practical for York to have installed mixing valves in the initial manufacture of its units nor would it have been feasible to attach the valves to the boilers other than at the time of installation. In any event, Levitt had specifically decided that it did not want mixing valves with the heating units and its purchase order

did not include them. Its engineer testified that Levitt had not followed York's recommendation with respect to the valves because Levitt believed that its system of combination spigots and cautionary instructions had operated with sufficient success in the past and that the attachment of mixing valves would present unnecessary service problems. In the developing steps towards higher consumer and user protection through higher trade morality and responsibility, the law should view trade relations realistically rather than mythically. Thus viewed, it is difficult to see how York could reasonably have been expected to do anything, other than fill Levitt's purchase order while expressing its recommendation in clear and strong terms as it did. Conceivably it might have refused to sell its heating units unless Levitt also purchased the valves but then Levitt could readily have purchased comparable heating units without valves from other manufacturers. And even if Levitt had purchased the valves from York, there was nothing York could do to compel their attachment or to prevent Levitt from pursuing its own chosen design and mode of installation. All in all, it would appear evident that York had not acted unreasonably, that no defaulting action on its part had proximately caused the injuries, and that no just purpose would be served by affixing responsibility to it in addition to Levitt for the injuries allegedly resulting from Levitt's defective design and installation.

The judgment of dismissal as to the defendant Levitt & Sons, Inc. is Reversed and the cause is Remanded for trial, costs to abide the event; the judgment of dismissal as to the other defendants is affirmed, without costs.

*For affirmance in part and reversal in part* — Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —6.