BILLY J. WAWAK v. ROBERT O. STEWART ET AL

5-5016                                              449 S. W. 2d 922

Opinion delivered February 2, 1970
[Rehearing denied March 9, 1970.]

1. VENDOR & PURCHASER—CAVEAT EMPTOR IN SALES OF REALTY—MOD-
   IFICATION OF RULE IN SALE OF NEW HOUSE BY BUILDER-VENDOR.
   —An implied warranty of fitness may be recognized in the sale
   of a new house by a seller who was also the builder.
2. COURTS—RULES OF DECISION—EFFECT UPON LEGISLATURE.—Court
   decisions have no effect upon General Assembly's freedom to
   change the law if it sees fit, but may focus legislative attention
   upon a problem.
3. COURTS—RULES OF DECISION—APPLICATION.—Rule modifying doc-
   trine of caveat emptor with respect to sale of a new house by
   builder-vendor is made applicable only to the case at hand and
   to causes of action arising after the decision becomes final.
4. CONTRACTS—CONSTRUCTION & OPERATION—EXCLUSION OF WARRAN-
   TIES.—Language in offer and acceptance agreement, which did
   not purport to exclude all warranties, applied only to defects
   that might reasonably have been discovered in the course of
   an inspection by a purchaser of average experience, but did not
   exclude an implied warranty with respect to a defect which lay
   beneath a concrete floor and could not have been discovered by
   even a careful inspection.
5. DAMAGES—MITIGATION—DUTY OF INJURED PERSON.—A plaintiff
   must use reasonable care to mitigate his damages and if the
   damages could have been avoided at reasonable expense the
   measure of damages is the amount of such expenses.
6. DAMAGES—MITIGATION—REPARATION BY WRONGDOER.—Purchaser's
   duty to mitigate damages held not to involve material neces-
   sary to correct the basic defect.
7. CONTRACTS—VERDICT & FINDINGS—WEIGHT & SUFFICIENCY OF EVI-
   DENCE.—Trial court's judgment that appellant was not entitled
   to judgment against appellee who installed the duct work under
   a subcontract held sufficiently supported by the proof.
8. APPEAL & ERROR—VERDICT & FINDINGS—WEIGHT & SUFFICIENCY OF
   EVIDENCE.—Recovery upon appellees' cross appeal denied under
   the rule that the verdict need not correspond in amount to the
   proof adduced by either party.

Appeal from Pulaski Circuit Court, Second Divi-
sion, *Warren Wood*, Judge; modified and affirmed.

*Tanner & Wallace*, for appellant.

*U. A. Gentry* and *Wright, Lindsey & Jennings*, for appellees.

*Stubblefield & Matthews* and *Joe Purcell*, Attorney General; *Don Langston, Mike Wilson* and *Milton Lue-ken*, Asst. Attys. Gen., *Amici Curiae*.

GEORGE ROSE SMITH, Justice. The defendant-appellant Wawak, a house builder, bought a lot in North Little Rock in the course of his business, built a house on it, and sold it to the appellees Stewart for $28,500. The heating and air-conditioning ductwork had been embedded in the ground before the concrete-slab floor was poured above that ductwork. Some months after the Stewarts moved into the house a serious defect manifested itself, in that heavy rains caused water and particles of fill to seep into the ducts and thence through the floor vents into the interior of the house, with consequent damage that need not be described at the moment.

The Stewarts brought this action for damages. The great question in the case, overshadowing all other issues, is whether there is any implied warranty in a contract by which the builder-vendor of a new house sells it to its first purchaser. The trial court sustained the theory of implied warranty and awarded the Stewarts damages of $1,309.

The trial court was right. Twenty years ago one could hardly find any American decision recognizing the existence of an implied warranty in a routine sale of a new dwelling. Both the rapidity and the unanimity with which the courts have recently moved away from the harsh doctrine of caveat emptor in the sale of new houses are amazing, for the law has not traditionally progressed with such speed.

Yet there is nothing really surprising in the modern trend. The contrast between the rules of law applicable to the sale of personal property and those ap-

plicable to the sale of real property was so great as to be indefensible. One who bought a chattel as simple as a walking stick or a kitchen mop was entitled to get his money back if the article was not of merchantable quality. But the purchaser of a $50,000 home ordinarily had no remedy even if the foundation proved to be so defective that the structure collapsed into a heap of rubble.

Several law review articles, of which the earliest was published in 1952, forecast the new developments. Their titles suggest their contents: Dunham, Vendor's Obligation as to Fitness of Land For a Particular Purpose, 37 Minn. L. Rev. 108 (1952); Bearman, Caveat Emptor in Sales of Realty—Recent Assaults Upon the Rule, 14 Vanderbilt L. Rev. 541 (1961); Haskell, The Case For an Implied Warranty of Quality in Sales of Real Property, 53 Georgetown L. Jour. 633 (1965); Roberts, The Case of the Unwary Home Buyer: The Housing Merchant Did It, 52 Cornell L. Q. 835 (1967). In 1963 a new edition of Williston's Contracts added its weight to the movement, pointing out a practical advantage in the new point of view: "It would be much better if this enlightened approach were generally adopted with respect to the sale of new houses for it would tend to discourage much of the sloppy work and jerry-building that has become perceptible over the years." Williston, Contracts, § 926A (3d ed. 1963).

In the past decade six states have recognized an implied warranty—of inhabitability, sound workmanship, or proper construction—in the sale of new houses by vendors who also built the structures. *Carpenter* v. *Donohoe*, 154 Colo. 78, 388 P. 2d 399 (1964); *Bethlahmy* v. *Bechtel*, 91 Idaho 55, 415 P. 2d 698 (1966); *Schipper* v. *Levitt & Sons*, 44 N. J. 70, 207 A. 2d 314 (1965); *Waggoner* v. *Midwestern Dev. Co.*, S. D., 154 N. W. 2d 803 (1967); *Humber* v. *Morton*, Texas, 426 S. W. 2d 554, 25 A. L. R. 3d 372 (1968); *House* v. *Thornton*, Wash., 457 P. 2d 199 (1969). The near unanimity of the

nimity of the judges in those cases is noteworthy. Of the 36 justices who made up the six appellate courts, the only dissent noted was that of Justice Griffin in the Texas case, who dissented without opinion.

A few excerpts from those recent opinions will illustrate what seems certain to be the accepted rule of the future. In the *Schipper* case the New Jersey court had this to say:

> The law should be based on current concepts of what is right and just and the judiciary should be alert to the never-ending need for keeping its common law principles abreast of the times. Ancient distinctions which make no sense in today's society and tend to discredit the law should be readily rejected. . . . We consider that there are no meaningful distinctions between Levitt's [a large-scale builder-seller] mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding considerations are the same.

* * *

> *Caveat emptor* developed when the buyer and seller were in an equal bargaining position and they could readily be expected to protect themselves in the deed. Buyers of mass produced development homes are not on an equal footing with the builder vendors and are no more able to protect themselves in the deed than are automobile purchasers in a position to protect themselves in the bill of sale. Levitt expresses the fear of "uncertainty and chaos" if responsibility for defective construction is continued after the builder vendor's delivery of the deed and its loss of control of the premises, but we fail to see why this should be anticipated or why it should materialize any more than in the products liability field where there has been no such result.

A similar point of view was expressed in the *House* case by the Washington Supreme Court:

> As between vendor and purchaser, the builder-vendors, even though exercising reasonable care to construct a sound building, had by far the better opportunity to examine the stability of the site and to determine the kind of foundation to install. Although hindsight, it is frequently said, is 20-20 and defendants used reasonable prudence in selecting the site and designing and constructing the building, their position throughout the process of selection, planning and construction was markedly superior to that of their first purchaser-occupant. To borrow an idea from equity, of the innocent parties who suffered, it was the builder-vendor who made the harm possible. If there is a comparative standard of innocence, as well as of culpability, the defendants who built and sold the house were less innocent and more culpable than the wholly innocent and unsuspecting buyer. Thus, the old rule of caveat emptor has little relevance to the sale of a brand-new house by a vendor-builder to a first buyer for purposes of occupancy.

> We apprehend it to be the rule that, when a vendor-builder sells a new house to its first intended occupant, he impliedly warrants that the foundations supporting it are firm and secure and that the house is structurally safe for the buyer's intended purpose of living in it. Current literature on the subject overwhelmingly supports this idea of an implied warranty of fitness in the sale of new houses.

The Supreme Court of Texas joined in the widespread criticism of the doctrine of *caveat emptor* in the *Humber* opinion:

> If at one time in Texas the rule of caveat emptor had application to the sale of a new house by a vendor-builder, that time is now past. The decisions

and legal writings herein referred to afford numerous examples and situations illustrating the harshness and injustice of the rule when applied to the sale of new houses by a builder-vendor, and we need not repeat them here. Obviously, the ordinary purchaser is not in a position to ascertain when there is a defect in a chimney flue, or vent of a heating apparatus, or whether the plumbing work covered by a concrete slab foundation is faulty.

*       *       *

The caveat emptor rule as applied to new houses is an anachronism patently out of harmony with modern home buying practices. It does a disservice not only to the ordinary prudent purchaser but to the industry itself by lending encouragement to the unscrupulous, fly-by-night operator and purveyor of shoddy work.

In 1957 an intermediate New Jersey court refused to recognize implied warranties in the sale of realty. *Levy* v. *C. Young Constr. Co.*, 46 N. J. Super. 293, 134 A. 2d 717, affirmed on other grounds 26 N. J. 330, 139 A. 2d 738 (1958). That case is no longer the law in New Jersey, owing to the New Jersey Supreme Court's decision in the *Schipper* case, but we should add that the intermediate court's arguments were fully answered by the Supreme Court of Idaho in *Bethlahmy* v. *Bechtel, supra*:

The reasoning of the majority in the New Jersey decision that chaotic uncertainty would pervade the entire real estate field if sellers were subject to liability for implied warranty of fitness, and that the rules of caveat emptor would work no harshness on purchasers of real estate, is fallacious, unrealistic and unjust when applied to the facts of the case before us. In the situation here the imposition of an implied warranty of fitness would work no more

uncertainty or chaos than the warranties commonly
applied in sales of personal property. Likewise, the
statement by the New Jersey court that the plain-
tiffs had an opportunity to protect themselves by
exacting warranties in the contract and reserving
them in the deed, has no application to the facts
of the case at bar. A buyer who has no knowledge,
notice, or warning of defects, is in no position to
exact specific warranties. Any written warranty de-
manded in such a case would necessarily be so gen-
eral in terms as to be difficult to enforce. It would
be like the verbal warranty by defendant in this
case, that the house would be a "quality home."

As might be expected, we have been presented with
the timeworn, threadbare argument that a court is legis-
lating whenever it modifies common-law rules to achieve
justice in the light of modern economic and technologi-
cal advances. That same argument was doubtless made
in a famous case that parallels this one: *MacPherson* v.
*Buick Motor Co.,* 217 N. Y. 382, 111 N. E. 1050, Ann.
Cas. 1916C, 440, L. R. A. 1916F, 696 (1916). There the
court, with respect to the sale of automobiles, abolished
a requirement of privity of contract that was just as
firmly embedded in the common law as is the rule that
we are now re-examining. Yet the doctrine of the *Mac-
Pherson* case is now accepted as commonplace through-
out the nation. We have no doubt that the modification
of the rule of *caveat emptor* that we are now consider-
ing will be accepted with like unanimity within a few
years.

After the case at bar had been submitted to the
court we invited the filing of *amici curiae* briefs, to
avoid the possibility that persuasive arguments might
be overlooked. The only brief that urges adherence to
the old rule was filed by counsel for the Arkansas Home
Builders Association.

The AHBA brief makes one point that merits com-

ment. Counsel state that the AHBA "recognizes the need for the imposition of a warranty upon new construction." To that end the Association included a one-year warranty requirement in a bill that it sponsored, unsuccessfully, in the 1967 and 1969 sessions of the legislature. The main purpose of the bill, however, was to regulate the homebuilding industry by the creation of a governing board and the imposition of licensing requirements upon those engaged in the business.

We are not impressed by the AHBA's suggestion that we await legislative action, even though the Association concedes that some form of warranty is needed. To begin with, the General Assembly's repeated refusal to enact the proposed law hardly gives assurance that it will be passed in the near future. Furthermore, whatever decision we reach in this case can have no effect upon the General Assembly's freedom to change the law as it sees fit. To the contrary, a judicial decision may focus legislative attention upon the problem. See, for example, Act 165 of 1969, which was a prompt legislative reaction to our decision in *Parish* v. *Pitts*, 244 Ark. 1239, 429 S. W. 2d 45 (1968).

To sum up, upon the facts before us in the case at bar we have no hesitancy in adopting the modern rule by which an implied warranty may be recognized in the sale of a new house by a seller who was also the builder. That rule, however, is a departure from our earlier cases; so, to avoid injustice, we adhere to the doctrine announced in *Parish* v. *Pitts*, *supra*, by which the new rule is made applicable only to the case at hand and to causes of action arising after this decision becomes final.

There are three subordinate points that require discussion. First, Wawak insists that all warranties, express or implied, were negatived by this paragraph in the offer-and-acceptance agreement that preceded the execution of a warranty deed when the sale was consummated:

Buyer certifies that he has inspected the property and he is not relying upon any warranties, representations or statements of the Agent or Seller as to age or physical condition of improvements.

Even if we assume that the preliminary contract was not merged in the warranty deed, we think it plain that the quoted paragraph did not exclude an implied warranty with respect to the particular defect now in question, which lay beneath the concrete floor and could not possibly have been discovered by even the most careful inspection. The quoted paragraph does not purport to exclude all warranties. It merely states that the buyer has inspected the property and is not *relying* on any warranties as to the age or physical condition of the improvements. Construing the printed contract against the seller, who evidently prepared it, we hold that the clause applies only to defects that might reasonably have been discovered in the course of an inspection made by a purchaser of average experience in such matters.

Secondly, the trial court's judgment for $1,309 was composed of the following items of damage to the house and its furnishings, none of which the Stewarts had yet paid:

| | |
|---|---:|
| To clean rug | $ 75.00 |
| To paint house (interior) | 235.00 |
| To clean furniture | 22.00 |
| To replace lamp shades | 35.00 |
| To clean duct system | 200.00 |
| To replace draperies | 300.00 |
| Minor repairs | 22.00 |
| Drain tile to correct leakage | 420.00 |
| | $1,309.00 |

Wawak insists that the recovery of the foregoing items is barred by the rule that a plaintiff must use reasonable care to mitigate his damages and that if the damages could have been avoided at reasonable expense then

the measure of damages is the amount of such expense. *Curtner* v. *Bank of Jonesboro,* 175 Ark. 539, 299 S. W. 994 (1927); *Louisville, N. O. & T. R. R.* v. *Jackson,* 123 Ark. 1, 184 S. W. 450, Ann. Cas. 1918A, 604 (1916); *Young* v. *Berman,* 96 Ark. 78, 131 S. W. 62, 34 L. R. A. (n. s.) 977 (1910).

The pertinent facts are these: The subterranean ductwork radiates from a metal chamber or plenum, which sits under the heating and air-conditioning units. When Wawak and his ductwork subcontractor, Plummer, were first notified by Stewart of the seepage, they siphoned off the water through the plenum. They next installed drain tile and gravel along two sides of the house, but those measures failed to correct the trouble. In the meantime Stewart bought a sump pump at a cost of $12.50. Whenever rains caused seepage in the ductwork Stewart would place his pump in the plenum, about two hours after the water had accumulated, and pump the duct system dry. Under that procedure some of the seepage got into the house and caused most of the damage that we have itemized above.

Soon after the difficulty first arose Wawak and Plummer proposed the installation of an automatic sump pump, which cost $76 or $78. Their plan was to dig out the floor of the plenum so that the automatic pump would be below the level of the ducts. Whenever the water at the site of the pump rose to a depth of three quarters of an inch the pump would start automatically and pump out the water. Thus the water would never rise high enough to overflow the floor vents and damage the interior of the house. Wawak and Plummer do not contend that their plan would have corrected the subterranean defect. From Wawak's testimony: "I figured if we could get the pump in there to pump it out, then we could continue to try to find out where [the water] was coming from. It wasn't our intention to just leave it." Wawak stated that when he offered to put in the automatic pump there was no damage to

the house except some staining of the draperies, which were cleaned at Wawak's expense.

Stewart refused to allow the automatic pump to be installed, insisting that he wanted to know where the water was coming from and would accept nothing less. When the proffer of the pump was refused, Wawak and Plummer abandoned their efforts to correct the trouble. Thereafter Stewart used his own pump in the manner that we have described, with attendant damage to the house and its furnishings. A period of two years or more elapsed before this action was finally brought.

In the main Wawak is correct in his argument that the Stewarts should have mitigated their damages by permitting the installation of the automatic pump. On the record made below it is an undisputed fact that such a pump would have avoided practically all the itemized damages that were allowed by the trial court.

The pump, however, would not have corrected the basic defect, nor does Wawak so contend. Stewart testified without contradiction and without objection that a man named Gordon could remedy the defect by installing drain tile along the remaining two sides of the house at a cost of $425. That corrective measure would not have been rendered unnecessary by the installation of the automatic pump; so the Stewarts' duty to mitigate their damages does not involve that item. The amount of the Stewarts' judgment will therefore be reduced to $420—the amount allowed by the trial court for the one item of damage that we find to be recoverable.

Thirdly, Wawak argues that he is entitled to judgment over against the appellee Plummer, who installed the ductwork under a subcontract with Wawak. It cannot be said as a matter of law, however, that Plummer was at fault, because the slab floor above the ducts was poured by another subcontractor. Upon this point the trial court's judgment is sufficiently supported by the proof.

Finally, what we have said also disposes of the appellees' cross appeal, by which they contend that the court erred in not allowing them the full amount of some of their itemized claims. In any event recovery upon the cross appeal would have to be denied under the rule established in *Fulbright* v. *Phipps,* 176 Ark. 356, 3 S. W. 2d 49 (1928), and the cases that have followed it, holding that the verdict need not correspond in amount to the proof adduced by either party.

The judgment as modified is affirmed.

HARRIS, C. J., and FOGLEMAN and BYRD, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting in part, concurring in part. In its approach to adoption of the modern rule, the majority has overlooked one important step in establishing a liability for breach of an implied warranty. The first step toward the application of the rule adopted is the necessity for evidence establishing a breach. The burden is on one asserting such a breach to prove it. *Hydrotex Industries* v. *Sharp,* 212 Ark. 886, 208 S. W. 2d 183; *Highsmith Brothers* v. *Hammonds,* 99, Ark. 400, 138 S. W. 635; *American Standard Jewelry Co.* v. *R. J. Hill & Son,* 90 Ark. 78, 117 S. W. 781; *Elmore* v. *Booth,* 83 Ark. 47, 102 S. W. 393.

The rules regarding this burden and its application to the imposition of implied warranties to real estate transactions involving the sale of dwelling houses are clearly recognized in cases relied upon by the majority. In *Bethlahmy* v. *Bechtel,* 91 Idaho 55, 415 P. 2d 698 (1966), that court said:

> "The implied warranty of fitness does not impose upon the builder an obligation to deliver a perfect house. No house is built without defects, and defects susceptible of remedy ordinarily would not warrant rescission. But major defects which render the house unfit for habitation, and which are not readily remediable, entitle the buyer to rescission and resti-

tution. The builder-vendor's legitimate interests are protected by the rule which casts the burden upon the purchaser to establish the facts which give rise to the implied warranty of fitness, and its breach. See *Schipper v. Levitt & Sons, Inc., supra.*"

In *Bechtel* the evidence was found sufficient to present an issue as to breach. The house in question was built over what had been an open irrigation ditch. The builder laid a water conduit in a trench dug along the course of the ditch and covered the ditch with earth. The conduit consisted of 10-inch drain tile in three-foot sections butted together without any water seal in the joints. The house was located so that this conduit was under the concrete floor of an attached garage, seven to nine feet north of the north wall of the house and two to three feet above the floor level of adjacent basement rooms. After the irrigation season opened, water naturally seeped in around the edges of the basement rooms and spread over the tiled floors. The soil settled away from the garage floor from two to twelve inches and was wet. A crack developed in the garage floor. It was the builder's opinion that the water came from the tiled ditch under the garage. Efforts were made by the builder to remedy the situation by re-routing the ditch and digging gravel-filled trenches. A hydrologist testified that, in his opinion, the water originally came from the covered tile and thereafter from a "perched" water table established by irrigation water accumulating above a hardpan. He also stated that the concrete in the basement walls and floor could have been made waterproof by proper mixture and care in construction. The damage shown was great enough that some rooms in the house had to be vacated and bricks were placed under furniture to prevent water damage thereto. Eventually the buyers moved out of the house because of the continued water seepage. The testimony of the hydrologist and other witnesses indicated that the condition would recur every irrigation season.

In *Schipper v. Levitt & Sons, Inc.,* 44 N. J. 70, 207

A. 2d 314 (1965), cited by the majority and in the *Bechtel* case, the court restated its position that it was necessary that there be sufficient evidence to prove negligent or defective construction. The court called attention to the fact that a former case had been affirmed because of the want of evidentiary support for a fact-finding of negligent or defective construction. On this subject that court said:

> "Levitt contends that imposition of warranty or strict liability principles on developers would make them 'virtual insurers of the safety of all who thereafter come upon the premises.' That is not at all so, for the injured party would clearly have the burden of establishing that the house was defective when constructed and sold and that the defect proximately caused the injury. In determining whether the house was defective, the test admittedly would be reasonableness rather than perfection. As was pointed out in *Courtois* v. *General Motors Corp.*, 37 N. J. 525, 182 A. 2d 545 (1962), the comparable warranty of merchantability in the sale of goods means only that the article is reasonably fit for the purpose for which it is sold and does not imply 'absolute perfection.' 37 N. J., at p. 543, 182 A. 2d 545. See *Jakubowski* v. *Minnesota Mining and Manufacturing*, 42 N. J. 177, 185, 199 A. 2d 826 (1964). And as Professor Noel has indicated, though the imposition of warranty or strict liability principles to a case of defective design, as alleged against Levitt here, would render unnecessary any allegation of negligence as such, it would not remove the plaintiffs' burden of establishing that the design was 'unreasonably dangerous' and proximately caused the injury. Noel, supra, 71 Yale L. J., at pp. 877-878; see also Prosser, 'The Assault Upon the Citadel (Strict Liability to the Consumer),' 69 Yale L. J. 1099, 1114 (1960).

\* \* \* We note, however, as indicated earlier in this

opinion, that even under implied warranty or strict liability principles, the plaintiffs' burden still remains of establishing to the jury's satisfaction from all the circumstances that the design was unreasonably dangerous and proximately caused the injury. See Noel, supra, 71 Yale L. J., at pp. 877-878; see also Prosser, supra, 69. Yale L. J., at p. 1114."

There the testimony showed that the builder had deliberately ignored cautions of the manufacturer relating to the necessity for controls on a hot water heater so that the water at the taps in the house would not be excessively hot. There was expert testimony by an engineer who had been employed by the builder and who was responsible for the design of hot water systems in houses built by this builder. He recognized that the temperature of the water from the hot water tap in the bathroom sink would be excessively high for domestic use and that the manufacturer had recommended control by a mixing valve outside the boiler.

In the other cases cited by the majority, there was direct evidence of negligent or defective construction. It is the contention of the appellant that appellee Stewart has failed to meet his burden of proof by an affirmative showing that appellant breached this implied warranty and that the house was not constructed in a good workmanlike manner. He argues that in effect the ruling of the lower court is that, without any proof or evidence, the house was not constructed in a good workmanlike manner and, without any proof whatever as to the cause of the problem, appellees should recover simply because they bought a new house and subsequently a water situation developed. Because I agree with appellant and both the trial court and this court seem to have ignored the factual situation. I deem it appropriate to state what the record reveals as undisputed evidence.

Appellant employed an experienced plumbing and

heating contractor to design, lay out and install the heating and air conditioning system. This contractor testified about the installation and described the steps in detail, stating that the work was done in compliance with accepted standards. The house was completed almost exactly one year before its sale to Stewart. The completion date enabled appellant to show the house in the Little Rock-North Little Rock Parade of Homes in September 1963. From this time on, appellant operated the heating and air conditioning system as a matter of preventive maintenance and experienced none of the difficulties about which the Stewarts later complained. The house has been occupied by the Stewarts from the time of their purchase on August 1, 1964. In March or April 1965, water and fill materials first seeped through the ducts and floor registers of the heating and air conditioning system into various rooms of the house. *It was stipulated that appellant had no knowledge or notice of any defects until report was made by Stewart.* The construction of "French drains" by Wawak along the front and one side of the house did not correct the situation. There is still a water problem every time it rains. The Stewarts admitted that they had been unable to ascertain the cause of the difficulty. Appellant testified that he had no idea what was causing the trouble. No one has determined the source. Plummer testified that no one knew how the water gets into the system, but that accumulated water will work through concrete. Wawak learned that there were houses in the Lakewood area in which the same problem had been remedied by the installation of a submergible pump of the type he offered to install in the Stewart house. Plummer had corrected a similar situation in a house on Waterside Drive by the same means. Mr. Gordon, an engineer employed by Stewart, did not know the source of the water problem, but assured Stewart that the problem could be solved by putting "French drains" on the other two sides of his house. Stewart had done some digging around the sides of the house to plant shrubbery and

flowers. He also dug two large holes within 20 feet of the house in which to plant pecan trees.

This evidence simply does not show the breach of any implied warranty. It seems significant to me that the Stewarts do not undertake to answer the argument of appellant in this regard in any way. In considering the question of evidence appellee Plummer appropriately argues that the period during which the system had operated satisfactorily was long enough that normal usage would bring any problems in construction to light. He calls our attention to the fact that the author of the article in the Vanderbilt Law Review, cited in the majority opinion, suggested a model act as one of the remedies for problems arising from the adoption of the implied warranty doctrine. He recommended a one-year statute of limitations and commented:

> "The statute of limitations in section 5 is short, only one year. The act is primarily designed to protect home buyers from structural defects and improper workmanship in newly constructed homes. One year represents a full seasonal cycle and should bring out all defects in existence at the time of the deed, or in case of an installment purchase, at the time the vendee took possession. *Defects which manifest themselves later are much more likely due to ordinary wear and tear or the elements, and the one year limitation is designed to prevent the jury's speculating on this and arriving at unreasonable results.*" (Emphasis mine.)

I do not believe that the court intends to apply res ipsa loquitur to such cases, but I fear that this is the effect of the action taken. The doctrine has no application to an action for breach of implied warranty. That is an action on contract. *Kapp* v. *Bob Sullivan Chevrolet Co.*, 232 Ark. 266, 335 S. W. 2d 819. We have recognized that even in a negligence action the doctrine does not apply unless there is first *proof* of the elements neces-

sary to bring it into play, that the inference arising from the rule does not supply the foundation facts and that its application to a particular set of facts cannot be based upon speculation. *Ford Motor Co.* v. *Fish,* 232 Ark. 270, 335 S. W. 2d 713. It was there recognized that it must be shown that the cause of the injury is an agency or instrumentality within the defendant's exclusive control and that the cause is not due to any voluntary action or contribution on the part of the plaintiff. These elements of proof are lacking here. In the *Fish* case, we relied on the logic of a quotation from *Haas* v. *Buick Motor Division,* 20 Ill. App. 2d 448, 156 N. E. 2d 263, 266 (1959), as follows:

> "The mere fact that an occurrence resulting in damage to property has happened does not authorize any presumption or inference that the defendant was at fault. * * * (Citations omitted.) The mere fact that a fire evidently occurred here, resulting in damage to the property, does not authorize any presumption or inference that the defendant was responsible therefor,—the burden was on the plaintiff to prove, among other things, that there was some material defect in materials or workmanship. * * * This is not a case for the application of some doctrine analogous to that of res ipsa loquitur."

An attempt to apply the res ipsa loquitur doctrine to an action for breach of implied warranty was rejected in *Ford Motor Co.* v. *Tritt,* 244 Ark. 883, 430 S. W. 2d 778. There we said that 16,000-mile use of an automobile wheel from December 1962 to March 1964, even without any evidence or use which might affect the condition of the wheel, made it almost imperative that expert testimony be used to show that a defect in the wheel was a manufacturing defect.

It is clear to me that the Stewarts failed to meet their burden of proof and that the judgment should be reversed as to them. To say the least the majority has

chosen a rickety vehicle upon which to transport a major industry into a new legal territory, the topography and boundaries of which have not even been explored, much less charted.

It is particularly important that the doctrine of stare decisis control in commercial cases where contractual and property rights have grown up and business practices developed in reliance thereon. Stability and uniformity of the law in these fields is more important than technical correctness, because day-to-day contracting and dealing must be conducted upon the assumption that yesterday's precedent will govern tomorrow's disputes.

I agree with my brother Byrd that such a step as this was more appropriately one for legislative action.

I take it to be conceded that the rule of caveat emptor heretofore applied in this field is one of common law. I cannot refrain from repeating the observation of the Chief Justice in his dissenting opinion in *Parish* v. *Pitts*, 244 Ark. 1239, 1255, 429 S. W. 2d 45, that the very first section appearing in our current digest of statutes provides that the common law of England of a general nature and not inconsistent with the constitution and laws of this nation, or this state, shall be the rule of decision in this state *unless altered or repealed by the General Assembly of this state.* Ark. Stat. Ann. § 1-101 (Repl. 1956). Nor can I abstain from repeating an interrogatory propounded in my dissenting opinion in that case, *i. e.,* "If Ark. Stat. Ann. § 1-101 (Repl. 1956) does not mean that this law can be altered or repealed by the General Assembly, only, then, I ask, what does it mean?" I have heard no satisfactory answer.

Merely to label an argument timeworn and threadbare does not make it so. Yet, being threadbare means only that the nap is worn, not that the fabric is pierced or the warp or woof weakened. To be timeworn is not

necessarily to be dilapidated. The wisdom acquired from experience of the ages is also ancient. I do not deem it the function of the judiciary to disregard such a statute merely because we think it is not abreast of the times or, in the modern lingo, not relevant. This is a peculiar function of the legislative branch.

Some of the courts which have adopted the "enlightened" approach to this problem have not had to hurdle the obstacle posed by § 1-101. For example, the Washington statute makes the common law the rule of decision so far as it is not incompatible with the institutions and condition of society in the state. In New Jersey, the 1948 constitution now in effect only provides that all law then in force remain in force until superseded, altered or repealed by the constitution or otherwise. New Jersey Constitution, Art. 11 § 1 Par. 3. This provision superseded an 1844 constitutional provision as to common law similar to our statute. Clearly, the common law rules could be superseded by judicial action in New Jersey.

Courts of other states simply by-pass the barrier, without mentioning it. Still others go traipsing off after decisions in states not faced with this obstacle, without noticing their own limitations. See, *e. g., Bethlahmy* v. *Bechtel,* 91 Idaho 55, 415 P. 2d 698 (1966), relying, at least in part, upon *Schipper* v. *Levitt & Sons, Inc.,* 44 N. J. 70, 207 A. 2d 314 (1965).

I humbly submit that no rule of English common law was altered in *MacPherson* v. *Buick Motor Co.,* 217 N. Y. 382, 111 N. E. 1050, Ann. Cas. 1916C 440, L. R. A. 1916F 696 (1916). As a matter of fact, Mr. Justice Cardozo reviews the English cases and finds some support for his result. He also found support in earlier cases in New York.

I fully recognize the necessity for growth and development of the law to fit the needs of our society in

the present generation without rigid adherence to principles satisfactory under conditions existing in a past generation. I do not recognize the power of the courts to invade the province of the legislative department in order to "update" the law.

To illustrate the necessity for legislative action to engraft this new doctrine upon our law, I point out that numerous sections of our commercial code are devoted to defining and circumscribing implied warranties in personal property transactions and in stating and limiting remedies for breaches. Each of these required a separate legislative decision at some point in the process of drafting and adoption.[1]

The alertness of our General Assembly to desirability for modernization of our law is aptly demonstrated by its adoption of the UCC long before it was adopted by most of our states. While the decision here necessitates legislative action to undo or limit the action here taken, I deplore the willingness of the court to hand a virtual mandate to the General Assembly to act in a field in which it has clearly indicated that it was not ready to legislate. While I agree that the law should require some type of warranty in situations like that treated by the majority, the investigative powers of the legislature are conducive to a thorough examination of all facets of the problem and are peculiarly suited to a clear definition of the extent and application of such a warranty. We can only meet the multiple questions which will now arise one by one on a case by case basis. The legislative branch can anticipate most of them.

I concur in the affirmance of the judgment in favor of Plummer.

---

[1]For example, see the following sections in Arkansas Statutes Annotated, Title 85: definitions, 1-201, 2-103, 2-106, 2-312, 2-314 & 315; rules bearing on rights and remedies, 2-210, 2-301, 2-302, 2-317 & 318, 2-510, 2-515, 2-607 & 608, 2-703, 2-706, 2-711—715, 2-717—721, 2-723, 2-725, 9-113, 9-206, 9-318; exclusion or modification, 2-316 (Add. 1961).

HARRIS, C. J., joins in this opinion.

CONLEY BYRD, Justice, dissenting. I do not believe that the people of this State elected me to Legislate on the subject of implied warranties in the sale of real estate. The present Constitution of the State of Arkansas and also the proposed Constitution places such matters before the General Assembly and I think for good reason. When this matter comes before the General Assembly, interested parties, other than the parties to this litigation, with intimate knowledge of the problems involved in placing an implied warranty of fitness upon a house will have an opportunity to be heard. However, today's decision will just as surely affect the method and cost of doing business of persons not a party to this litigation as would such action by the General Assembly, but our rules of procedure do not permit such parties to even be heard on a petition for rehearing.

The personal property warranties, including those involved in the purchase of a shoe string, have been the subject of much thought before legislation regulating the same was enacted, see Uniform Sales Act and the Uniform Commercial Code, Act 185 of 1961. Furthermore under the Uniform Commercial Code, Ark. Stat. Ann. § 85-2-316 (3)(a) (Add. 1961), even a blind purchaser of a shoe string could not recover upon an implied warranty of fitness if he bought the shoe string under a contract stating that he was not relying upon any warranties made by the seller. Ark. Stat. Ann. § 85-2-316 provides:

"(2) . . . Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'

"(3) Notwithstanding subsection (2)

"(a) unless the circumstances indicate otherwise,

all implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

"(b) . . .

"(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade."

Therefore even if we applied the statutory warranty law applicable to personal property, the implied warranty which the majority here finds would be excluded not only by the language in the sales contract but also by the *usage of trade* under subsection (3)(c) of Section 85-2-316 of the Commercial Code.

For these reasons, I respectfully dissent.