Edith A. BERMAN, Appellant,

v.

WATERGATE WEST, INC., a corporation, and Riverview Realty Corporation, Appellees.

No. 11145.

District of Columbia Court of Appeals.

Argued March 17, 1977.

Decided Sept. 6, 1978.

Edith A. Berman, pro se.

Mark P. Friedlander, Washington, D. C., for appellee Watergate West, Inc.

Harlan L. Weiss, Washington, D. C., with whom Leonard C. Greenebaum, Washington, D. C., was on the brief, for appellee Riverview Realty Corp.

Before KELLY, NEBEKER and MACK, Associate Judges.

MACK, Associate Judge:

Appellant is a tenant-shareholder in the Watergate West housing cooperative. Appellees are Riverview Realty Corporation ["Riverview"], which is the company that

marketed the cooperative apartments to the public, and Watergate West, Inc. ["Watergate West"], which is the cooperative itself. The suit was filed in 1971 for damages flowing from the breach of express and implied warranties. The complaint alleges that from the time appellant moved into the cooperative in 1969, her apartment was defective in many respects.

In 1976, a jury trial commenced. At the close of appellant's case, before either Watergate West or Riverview had presented their defenses, the trial court directed a verdict for both appellees, ruling that appellant had failed to show any contractual obligation on the part of Riverview, and had failed to prove damages. In addition, the trial court ordered that appellant pay appellees' costs of action. In order to avoid further expense, appellant filed the instant appeal pro se.

■ From one point of view this is a simple case. It involves a mass-produced product which allegedly reached the ultimate consumer in a defective state and caused property damage. In such circumstances, the law is clear that the consumer has a cause of action against all who participated in placing the product into the stream of commerce. The case, however, has not proved simple. Confusion arose partly because of the way in which the particular product was marketed (through a cooperative) and partly because of the use of one mischievously ambiguous word (warranty). In reversing, we do not pretend to deal with every issue which could be raised on the basis of the facts here. We wish only to clarify that the remedies of the injured consumer in such a situation do "not . . . depend upon the intricacies of the law of sales." *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 64, 27 Cal.Rptr. 697, 701, 377 P.2d 897, 901, (1962) (en banc).

## I.

## BACKGROUND

A developer of mass-produced housing has a number of choices as to how to mar-

ket his completed product. One way in which that product can be marketed is as a cooperative. Where this is done, the developer does not sell the individual housing units directly to the ultimate consumer. Rather, the developer sells the whole building to a corporation [the "cooperative"] of which the ultimate consumer is a stockholder, and from which that consumer then rents an individual unit. The marketing of the Watergate West housing cooperative proceeded as follows.

In 1964, Watergate Improvements Associates ["WIA"], a limited partnership, was formed to sponsor a housing project. A subsidiary of WIA, Watergate Construction Corporation, was formed to build the cooperative. Another subsidiary of WIA, Riverview Realty Corporation, acted as sales agent.

On August 24, 1967, before construction of the building began, Watergate West, the cooperative, was chartered. From that date until June 1969, when an independent board of directors was elected, WIA controlled Watergate West.

On August 25, 1967, a prospectus was issued describing the project. The front page of the prospectus states in bold letters:

**WATERGATE WEST INC.**
**PRESENTED BY:**
**RIVERVIEW REALTY CORPORATION**
　　Plan of Cooperative Organization and Subscription and Deposit Agreement.

The closing page of this document states:

**DATED THIS 25TH DAY OF AUGUST, 1967.**
**WATERGATE IMPROVEMENT**
**ASSOCIATES (a limited partnership)**
**SPONSOR.**

Persons wishing to buy an interest in the planned cooperative signed the subscription and deposit agreement referred to in the prospectus. The agreement is, on its face, between the subscribing member and the cooperative, Watergate West. Appellant signed such an agreement on September 19, 1967.

In 1969, after the cooperative was constructed, the subscribing members signed a

Cooperative Apartment Proprietary Lease and Occupancy Agreement which gave them the right to occupy their apartments for 99 years in exchange for the payment of a monthly assessment. Like the stock subscription agreement, the lease is, on its face, between the subscribing member and the cooperative, Watergate West.

Appellant's lease agreement is dated January 14, 1969. On January 14, 1969, however, Watergate West did not own the building. As a result, appellant also signed a subsidiary agreement with Riverview whereby she agreed to remit monthly rent payments to Riverview if she should occupy her apartment before the cooperative acquired title to the building. Appellant moved into her apartment on January 28, 1969. The cooperative acquired title to the building on May 1, 1969.

## II.

### THE PROCEEDINGS IN THE TRIAL COURT

As noted above, the complaint in this case alleges breach of express and implied warranties. More particularly, the complaint alleges that appellees breached these warranties by delivering to appellant an apartment containing numerous defective appliances; that these appliances included a defective air conditioning system; that this air conditioning system caused damage to the parquet floors, the wall, and the wool rug and pad in her bedroom; and "that said breaches of warranty have continued from the date of said agreement, January 14, 1969 to the present . . . [and] have rendered said apartment at least 50% uninhabitable from January 1969 until the present."

Watergate West responded to this complaint as follows:

That on January 14, 1969, when the plaintiff first occupied her apartment . . . she occupied it as a tenant, and at that point all the defects alleged by her to exist, did exist. At that time she dealt exclusively with Riverview Realty Corporation, which was the agent for the

promoters of the project. That Watergate West, Inc. did not become the owner of the building . . . until May 1, 1969, long after all of these defects had been noted and objected to.

Riverview answered the complaint by denying the existence of any express or implied warranties. In addition, Riverview filed a motion for summary judgment, supported by an affidavit and memorandum, alleging that Riverview could not be held liable on the contracts between appellant and Watergate West because "Riverview Realty Corporation acted as agent for Watergate West, Inc. in negotiating with the plaintiff and other purchasers of cooperative apartments in said building, and the fact of its agency and the identity of its principal were disclosed to the plaintiff."

Appellee Watergate West, but not appellant, filed a memorandum in opposition to Riverview's motion. In that memorandum, Watergate West contended that Riverview "[had not acted] as agents for Watergate West but [had acted] for themselves and the other promoters." Watergate West then went on to argue that appellant did have a valid cause of action against Riverview, because "at the time the building was conveyed [to Watergate West] it was defective in many respects, including the items alleged by the plaintiff herein."

Riverview's motion for summary judgment was denied and the case went to trial. At trial, appellant recounted the circumstances of her purchase of an interest in the cooperative. She then described the defects she found in the apartment when she moved in, the most serious of which was the malfunctioning of the air conditioning unit. According to appellant's testimony, the air conditioner created such serious humidity in her bedroom that she had to keep the door to that room closed and sleep in her living room for two years, until the unit was repaired. Another witness, a member of the by-then independent board of directors of the cooperative, fully corroborated appellant's testimony in this regard.

At the close of appellant's case, Riverview moved for a directed verdict, arguing as follows:

[COUNSEL FOR RIVERVIEW]: Your Honor, starting in at the beginning we move that there has been absolutely no showing in this case of any liability on the part of Riverview Realty. Backing up one step further, there has been shown no duty on the part of Riverview Realty Corporation.

Your Honor, the complaint in this case alleges the breach of warranties made— allegedly made by Watergate West, Inc.- Riverview Realty Corporation. Those warranties—there has been no shred of testimony concerning any warranties made by Riverview.

. . . . .

The two agreements that have been entered into evidence [the stock subscription agreement and the proprietary lease], show on their face, one, that Riverview Realty Corporation was not a party to this agreement. They are not executed by or on behalf of Riverview Realty Corporation. Further, the two agreements show, and these portions were read to the jury, what the various connections were between the parties. The Riverview Realty Corporation was a managing agent for Watergate West, Inc. Watergate West—Riverview was a managing and sales agent and for a disclosed principal. So there has been running no duty.

. . . . .

Further, there is a stipulation among counsel that as used in these agreements, and we read them to the jury, the sponsor, Watergate Improvements, is not a party to this suit. The sponsor presented these documents. Riverview was the managing company for a disclosed principal, *Watergate Improvements* [emphasis supplied] and Watergate West, Inc. technically wasn't in existence until May 1969,[1] so they—

THE COURT: It's right there what bothers me. These documents are headed Watergate West, Inc., aren't they?

[COUNSEL FOR RIVERVIEW]: That's correct.

THE COURT: They are dated January, 1969, aren't they?

[COUNSEL FOR RIVERVIEW]: That's correct, your Honor.

THE COURT: And in the Fall of sixty—

[COUNSEL FOR WATERGATE WEST]: Sixty-seven, I think. There's some of them sixty-seven.

THE COURT: Yes. If Watergate West, Inc. was not in existence, what are they doing executing agreements?

[COUNSEL FOR RIVERVIEW]: Your Honor, the Cooperative was a proposed Cooperative at that time. . . .

THE COURT: Now, what I got in evidence here is a document purportedly signed by Watergate West, Inc. Now as far as you're concerned that isn't Riverview Realty. . . . There isn't anything here about Riverview Realty.

[COUNSEL FOR RIVERVIEW]: Your Honor, confining my comments specifically to Riverview Realty there is no specific testimony that we did anything or much less gave these warranties. I have already discussed, your Honor, the air conditioning and what the testimony did show with regard to that one specific air conditioner was by the Watergate Construction Company. As far as the testimony concerning the warranties, they were from the manufacturer in that regard.

THE COURT: Well, I don't understand that. Now, the warranty is from Watergate, whichever one. There's three of them. Watergate something . . . . .

Argument concerning Riverview's motion continued for some time along these lines. At one point the trial court frankly admitted:

As a matter of fact, from the evidence here so far, I don't know who has done what, to tell the truth.

Nevertheless, the court finally granted Riverview's motion, reasoning as follows:

---

1. As noted above, Watergate West was incorporated in 1967, although it did not acquire the Watergate West building until May 1969, and did not have an independent board of directors until June 1969.

. . . The mere fact that you've got a stipulation in here that Riverview Realty Company was an agent handling and policing and selling these apartments, that does not make Riverview contractually liable to the person who buys an apartment or any condition in the apartment. . . . [The] evidence . . . doesn't show any contractual liability on the part of the Riverview Realty Company. It shows that they were the agents for the selling and the leasing of the stuff on behalf of whoever among this conglomeration of corporations they had down there who really owns and runs and sells these things, but it doesn't show that Riverview is making any warranties or guarantees or anything of that sort to the plaintiff. . . . I grant the motion.

The court then listened to argument from the cooperative, and finally directed a verdict for the cooperative as well, on the grounds that "[e]ven if by some wild stretch of legal imagination you could say that the evidence brings in these two defendants, you still haven't proven any damages."

### III.

### DISCUSSION

(A) The area of law which governs here is the law of products liability. That area of the law has, in the past decade and a half, developed at a breathtaking pace. The field is succinctly described in 72 C.J.S. Supp. *Products Liability* § 3 at p. 5 (1975) in the following manner.

In general, products liability, in whatever form manifested, is viewed as an area of tort law, dealing with recourse for personal injury or property damage resulting from the use of a product, and in its broadest sense, it may cover actions for negligence, breach of warranty, or strict liability in tort. Over the years, numerous theories of recovery have evolved within the ambit of products liability, but these were refined and consolidated until the theory of strict liability evolved to complement the traditional warranty and negligence theories. Dis-

tinctions between the various doctrines of product liability as they presently exist frequently have more theoretical than practical significance . . . . [Footnotes omitted.]

The instant case is a suit for breach of express and implied warranty. Liability for breach of warranty "is a curious hybrid, born of the illicit intercourse of tort and contract . . . ." W. Prosser, Law of Torts § 95 at 634 (4th ed. 1971). Its evolution has been traced as follows.

Historically . . . an action for breach of warranty was essentially one in tort for deceit, differing, however, in that no knowledge on the part of the seller of the unfitness of the product had to be shown. Through changes in common-law pleading, an additional remedy for breach of warranty was found by the introduction of the method of declaring on warranty *indebitatus assumpsit.* This action was predicated upon the contractual relation between the buyer and seller, and an implied promise of the seller to pay a fair amount for his failure to fulfill his implied promise or warranty. . . . However, by the adoption of *assumpsit* as the almost exclusive remedy for breach of warranty, there was a transition of its status from tort to contract. [1 Prod. Liab.Rep. (CCH) ¶ 4030 at 4021.]

As the excerpt makes clear, liability in warranty was gradually limited to cases involving contracts. This limitation undoubtedly served "to curtail the virtually limitless liabilities of the earlier law, perhaps, as some have suggested, to protect infant enterprises in the formative years of the industrial revolution." Note, *The Expanding Scope of Enterprise Liability,* 69 Colum.L.R. 1084, 1084 (1969) (footnote omitted). As the infant enterprises of the early industrial revolution became the mass manufacturers of modern day society, however, the law of warranty began to shed its contractual trappings once more. Finally, in *Greenman v. Yuba Power Products, Inc.,* supra at 57, 27 Cal.Rptr. at 697, 377 P.2d at 897, the California Supreme Court decided

to discard the language of contract entirely. In that case, Chief Justice Traynor wrote:

> Although . . . strict liability [for placing defective products into the stream of commerce] has usually been based on the theory of an express or implied warranty . . . the abandonment of the requirement of a contract . . . the recognition that the liability is not assumed by agreement but imposed by law . . ., and the refusal to permit [disclaimers] . . . make clear that the liability is not one governed by the law of contract warranties but by the law of strict liability in tort. [*Id.* at 63, 27 Cal.Rptr. at 701, 377 P.2d at 901.]

Three years after *Greenman v. Yuba Power Products, Inc.*, was decided, § 402A was added to the Restatement of Torts. That section reads as follows:

§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Comment *m* to the Restatement reads:

*m. "Warranty."* . . .

A number of courts, seeking a theoretical basis for the liability, have resorted to a "warranty," either running with the goods sold, by analogy to covenants running with the land, or made directly to the consumer without contract. In some instances this theory has proved to be an unfortunate one. Although warranty was in its origin a matter of tort liability, and it is generally agreed that a tort action will still lie for its breach, it has become so identified in practice with a contract of sale between the plaintiff and the defendant that the warranty theory has become something of an obstacle to the recognition of the strict liability where there is no such contract. There is nothing in this Section which would prevent any court from treating the rule stated as a matter of "warranty" to the user or consumer. But if this is done, it should be recognized and understood that the "warranty" is a very different kind of warranty from those usually found in the sale of goods, and that it is not subject to the various contract rules which have grown up to surround such sales.

Subsequent to the decision in *Greenman v. Yuba Power Products, Inc.* and the promulgation of § 402A of the Restatement, the concept of strict liability in tort spread rapidly. At the date of this writing, the CCH Products Liability Reporter lists 45 states as having adopted the concept.[2] One other state[3] and the District of Columbia are cautiously placed on this list with a footnote reading "inferred by court decision."

**2.** Those states are Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington and Wisconsin. *See* 1 Prod.Liab.Rep. (CCH) ¶ 4060 at 4036–37.

**3.** The state is Utah.

The court decision from which our adoption of the concept of strict liability in tort can be inferred is *Cottom v. McGuire Funeral Service, Inc.,* D.C.App., 262 A.2d 807 (1970). In that case, Chief Judge Hood wrote as follows:

> [T]he trend appears to be towards a complete abandonment of any concept of contract law in cases of injuries caused by defective products, and the imposition on the manufacturer and sellers of a strict liability in tort. See *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049 (1963). Other cases so holding are collected in 1 American Law of Products Liability § 5A:2 (Supp.1969). The strict liability doctrine has been adopted in the Restatement (Second) of Torts § 402A (1965). In comment "1" to the foregoing section it is said: "The liability stated is one in tort, and does not require any contractual relation, or privity of contract, between the plaintiff and defendant."

> It has been said that the current doctrines of implied warranty and strict liability in tort are but two labels for the same legal right and remedy, as the governing principles are identical. This to a large extent is true. The differences between strict liability in tort and implied warranty, if any, are conceptual. "Implied warranty recovery is based upon two factors: (a) The product or article in question has been transferred from the manufacturer's possession while in a 'defective' state * * * and (b) as a result of being 'defective', the product causes personal injury or property damage." On the other hand, strict liability in tort is imposed on a manufacturer "when an article he places on the market * * * proves to have a defect that causes injury to a human being" or his property. *Whether contract or tort, there is a liability imposed for injury caused by placing a defective product into the stream of commerce in the District of Columbia.* [*Id.* at 808–09 (footnotes omitted) (emphasis supplied).]

See also *Stewart v. Ford Motor Co.,* 179 U.S.App.D.C. 396, 402, 553 F.2d 130, 137 (1977).

■ (B) The sale of an interest in a cooperative does not at first blush appear to fall within the purview of products liability law. Despite one court's characterization, the transaction does not strike one as a sale of "goods." See *Silverman v. Alcoa Plaza Associates,* 37 A.D.2d 166, 172, 323 N.Y.S.2d 39, 45 (1971). Yet even if we recognize to the sale of realty, the result is the same. For it is by now widely accepted that the law of products liability applies not only to the sale of goods, but also to the sale of newly constructed homes. Thus, in the leading case of *Schipper v. Levitt & Sons, Inc.,* 44 N.J. 70, 90, 207 A.2d 314, 325 (1965), the Supreme Court of New Jersey wrote:

> We consider that there are no meaningful distinctions between [the] mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same. That being so, the warranty or strict liability principles . . . should be carried over into the realty field.

See also *Kriegler v. Eichler Homes, Inc.,* 269 Cal.App.2d 224, 227, 74 Cal.Rptr. 749, 752 (1969) using almost identical language. At date, a list of the cases which have extended products liability law to the sale of new homes, whether under the rubric of strict liability or warranty, includes: *Cochran v. Keeton,* 287 Ala. 439, 252 So.2d 313 (1971); *Wawak v. Stewart,* 247 Ark. 1093, 449 S.W.2d 922 (1970); *Kriegler v. Eichler Homes, Inc., supra; Carpenter v. Donohoe,* 154 Colo. 78, 388 P.2d 399 (1964); *Gable v. Silver,* 258 So.2d 11 (Fla.App.), *cert. discharged,* 264 So.2d 418 (Fla.1972); *Bethlahmy v. Bechtel,* 91 Idaho 55, 415 P.2d 698 (1966); *Weck v. A:M Sunrise Construction Co.,* 36 Ill.App.2d 383, 184 N.E.2d 728 (1962); *Barnes v. Mac Brown & Co.,* 342 N.E.2d 619 (Ind.1976); *Theis v. Heuer,* 149 Ind.App. 52, 270 N.E.2d 764 (1971), transfer granted and opinion adopted, 280 N.E.2d 300 (Ind.1972); *Crawley v. Terhune,* 437 S.W.2d 743 (Ky.App.1969); *Gardenvillage Realty Corp. v. Russo,* 34 Md.App. 25, 366

A.2d 101 (1976) (dicta); *Gautheir v. Mayo,* 77 Mich.App. 513, 258 N.W.2d 748 (1977); *Weeks v. Slavick Builders, Inc.,* 24 Mich. App. 621, 180 N.W.2d 503, *aff'd,* 384 Mich. 257, 181 N.W.2d 271 (1970); *Smith v. Old Warson Development Co.,* 479 S.W.2d 795 (Mo.1972) (en banc); *Worrell v. Barnes,* 87 Nev. 204, 484 P.2d 573 (1971); *Schipper v. Levitt & Sons, Inc., supra; Hartley v. Ballou,* 20 N.C.App. 493, 201 S.E.2d 712 (1974); *Jones v. Gatewood,* 381 P.2d 158 (Okl.1963); *Yepsen v. Burgess,* 269 Or. 635, 525 P.2d 1019 (1974) (en banc); *Elderkin v. Gaster,* 447 Pa. 118, 288 A.2d 771 (1972); *Padula v. J.J. Deb-Cin Homes, Inc.,* 111 R.I. 29, 298 A.2d 529 (1973); *Waggoner v. Midwestern Development, Inc.,* 83 S.D. 57, 154 N.W.2d 803 (1967); *Humber v. Morton,* 426 S.W.2d 554, 25 A.L.R.3d 372 (Tex.1968); *Bolkum v. Staab,* 133 Vt. 467, 346 A.2d 210 (1975); *Rothberg v. Olenik,* 128 Vt. 295, 262 A.2d 461 (1970); *House v. Thornton,* 76 Wash.2d 428, 457 P.2d 199 (1969); *Tavares v. Horstman,* 542 P.2d 1275 (Wyo.1975). *See also Javins v. First National Realty Corp.,* 138 U.S.App.D.C. 369, 374, 428 F.2d 1071, 1076 (1970), citing some of the earliest of these cases with approval.

Perhaps the case most closely on point is *Gable v. Silver, supra,* where condominium apartment owners sued the builder-developer of the condominium for damages caused by defects in the air conditioning system. In upholding the trial court's award of damages in that case, the Supreme Court of Florida wrote:

> We are convinced, based upon present day trends, logic, and practical justice in realty dealings, that . . . implied warranties of fitness and merchantability [should] extend to the purchase of new condominiums in Florida from builders. [*Id.* at 18.] [4]

---

4. We note that subsequent to *Gable v. Silver, supra,* the Florida legislature passed a Condominium Act [Fla.Stat. Ch. 718 (1977)] and a Cooperative Act [Fla.Stat. Ch. 719 (1977)] both of which contain the following provision:

Warranties.—

(1) The developer shall be deemed to have granted to the purchaser of each unit an implied warranty of fitness and merchantability for the purposes or uses intended as follows:

(a) As to each unit, a warranty for 3 years commencing with the completion of the building containing the unit.

(b) As to the personal property that is transferred with, or appurtenant to, each unit, a warranty which is for the same period as that provided by the manufacturer of the personal property, commencing with the date of closing of the purchase or the date of possession of the unit, whichever is earlier.

(c) As to all other improvements for the use of unit owners, a 3-year warranty commencing with the date of completion of the improvements.

(d) As to all other personal property for the use of unit owners, a warranty which shall be the same as that provided by the manufacturer of the personal property.

(e) As to the roof and structural components of a building or other improvements and as to mechanical, electrical, and plumbing elements serving improvements or a building, except mechanical elements serving only one unit, a warranty for a period beginning with the completion of construction of each building or improvement and continuing for 3 years thereafter or 1 year after owners other than the developer obtain control of the association whichever occurs first.

(f) As to all other property which is conveyed with a unit, a warranty to the initial purchaser of each unit for a period of 1 year from the date of closing of the purchase or the date of possession, whichever occurs first. [Fla.Stat. § 718.203 and § 719.203 (1977).]

"Developer" is defined as "a person who creates a [condominium or cooperative] or who offers [condominium] or [cooperative] parcels for sale or lease in the ordinary course of business . . . ." [Fla.Stat. § 718.103(13) and § 719.103(12) (1977).]

The District of Columbia Council has also recently passed a Condominium Act which provides:

(b) Notwithstanding anything in this section to the contrary the declarant shall warrant against structural defects, each of the units for one year from the date each is conveyed and all of the common elements for two years. . . . For the purposes of this subsection, structural defects shall be those defects in components constituting any unit or common element which reduce the stability or safety of the structure below accepted standards or restrict the normal intended use of all or part of the structure and which require repair, renovation, restoration, or replacement. . . . [Condominium Act of 1976, D.C.Law No. 1–89, § 307(b).]

The term "declarant" is defined to include ". . . all persons who execute or propose to execute the declaration [of condominium] or on whose behalf the declaration is executed or

(C) The cases cited in section III(B) of this opinion make it clear that if the sponsor of the Watergate project had been a single corporate entity, and the sponsor had built the complex itself and sold the individual units outright to the consumer, the sponsor would be liable under products liability theory to the extent the units proved defective.

■ The question before us today is where responsibility should be placed for damage caused by similar defects when the sponsor does not do business as a single corporation, but rather subdivides itself into a builder, an owner, and a vendor; and does not sell the units outright to the consumer, but rather transfers title to a cooperative and markets those units as proprietary leaseholds. The court below held that appellant had no cause of action against Riverview, as there was no contract between her and that corporation. There was also no contract between appellant and Watergate Improvement Associates. Nor was there any contract between appellant and Watergate Construction Corporation. Nevertheless, each one of those entities was an "integral part of the overall producing and marketing enterprise" that placed the defective product into the stream of commerce. *Vandermark v. Ford Motor Co.*, 61 Cal.2d 256, 262, 391 P.2d 168, 171, 37 Cal. Rptr. 896, 899 (1964). *See also Cottom v. McGuire Funeral Services, Inc., supra*. Accordingly, each one of them can be held accountable to the ultimate consumer for damage caused by the defective product.

(D) Whether the cooperative can or should also be held accountable is another question. In the present posture of this case, a decision regarding Watergate West's liability would be premature. Because of the arguments made on appeal, however, we think a few comments are warranted.

In many respects the cooperative is like any other landlord. *See 1901 Wyoming Avenue Cooperative Association v. Lee*, D.C. App., 345 A.2d 456, especially at 458 n.2 (1975). Admittedly, there are differences between watergate West and other landlords. It does not appear, however, that these differences should have any significance in the present context.[5] Certainly, as regards the ability to redistribute or insure against loss caused by defective products, the cooperative is no differently situated than any other landlord. *See P. Rohan and M. Reskin*, 2 Cooperative Housing Law and Practice, ¶ 12.02[2][d] at 12–5 to 12–6.

There is reason to believe that a landlord could be held strictly liable for damages caused to a tenant by defective equipment. *See, e. g., Golden v. Conway*, 55 Cal.App.3d 948, 960–63, 128 Cal.Rptr. 69, 77–79 (1976). Moreover, in some circumstances this liability might attach even though the landlord acquired the building subsequent to installation of the equipment. *See Ray v. Alad Corp.*, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977); *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976); *Wilson v. Fare Well Corp.*, 140 N.J. Super. 476, 356 A.2d 458 (1976).

On the other hand, where there appears to be nothing standing in the way of recovery from those who are primarily responsible for placing the defective products into the stream of commerce, some courts have declined to extend the law of products liability to its furthest reach. *See Schipper v. Levitt & Sons, Inc., supra*, 44 N.J. at 96–97, 207 A.2d at 328–29; *Goldberg v. Kollsman Instrument Corp.*, 12 N.Y.2d 432, 437, 240 N.Y.S.2d 592, 595, 191 N.E.2d 81, 83 (1963). *Cf. Ray v. Alad Corp., supra*, 19 Cal.3d at 32–33, 136 Cal.Rptr. at 580–81, 560 P.2d at

proposed to be executed. . . ." [*Id.* at § 102(k).] The District of Columbia Council has, moreover, indicated that similar legislation dealing with cooperatives is in the planning. *See* Resolution 2–339, July 1, 1978, 25 D.C.R. 529.

5. Notably, the *Javins* court, which was among the first to extend products liability theory to the landlord-tenant field, made no distinction between cases involving cooperatives and con-

ventional landlord-tenant cases, citing them indiscriminately alongside each other. *See Javins v. First National Realty, supra*, 138 U.S. App.D.C. at 374 n.26, 428 F.2d at 1076 n.26. *See also* P. Rohan and M. Reskin, 2 Cooperative Housing Law and Practice, ¶ 12.02[2][d] at 12–5, where it is said that "[t]he Cooperative's liability exposure is as extensive as that of any apartment house owner."

**1360**

9–10. Whether a similar result should obtain in the instant case, is a question which can be explored on remand.

■ (E) Turning finally to the proof of damages, we note initially that every time appellant tried to give a monetary figure regarding the amount of damages, an objection was made and, for reasons which do not appear, sustained. For example, with respect to the wool rug and pad which she claimed the defective air conditioning had spoiled, the following interchange occurred:

[APPELLANT]: [A]lmost the whole room was covered with this fine wool rug, and I had purchased a brand new pad for that rug and at that time those prices in '69, it was something like forty-five dollars for just the pad and—

[COUNSEL FOR RIVERVIEW]: Objection, your Honor, to the comments just testified to.

[APPELLANT]: Okay. I'll keep them to myself. I'm sorry. Okay. That you don't like then, I'm sorry.

THE COURT: All right. The objection is sustained.

Aside from this, however, the record clearly demonstrates that appellant was unable to use her bedroom for some two years. The lease for appellant's apartment was in evidence. On this basis, the jury could have arrived at a perfectly proper measure of consequential damages. *See* 2 L. Frumer and M. Friedman, *Products Liability* § 16.-01[2] and cases cited therein at n.6. *See also Dravillas v. Vega,* D.C.App., 294 A.2d 363 (1972); *McCrossin v. Hicks Chevrolet, Inc.,* D.C.App., 248 A.2d 917, 921 (1969).

Accordingly, the trial court's order is reversed and the case remanded for proceedings consistent with this opinion.

*It is so ordered.*

NEBEKER, Associate Judge, dissenting:

The thesis of the majority opinion is that one who is a part of the building and selling of homes, or, as the majority puts it, places them "into the stream of commerce," is liable for damage to the ultimate purchaser which results from defects in the property. Regardless of whether this is an accurate statement of the law in many jurisdictions,

I submit that the proposition is wholly inapplicable to this case.

The record shows only that the appellee, Riverview Realty, was a real estate agent for the selling of the cooperative apartment for a company called Watergate Improvement Associates. The record does not show that Riverview was a builder, a seller or a manufacturer. There is absolutely no evidentiary support for the majority's assumption that Riverview was one and the same with the developers and builders of the project. Without evidence of such a connection, Riverview cannot be held liable for product defects on any theory.

Not one of the many cases cited in the majority opinion holds that a real estate broker is liable to purchasers for damage resulting from defects in the real estate or the improvements, nor do I think the majority legitimately could intend to so hold. Nonetheless, given this record and the obvious effort to rule so broadly, that is precisely what the majority is holding. What the consequences of this holding will be on the present and projected efforts to provide housing in the National Capitol, I am not able to say. Surely this decision will come as a shock to those so engaged.

Accordingly, I must dissent.